Darryl **PRUITT**, Plaintiff-Appellee,

v.

The **CITY OF MONTGOMERY, ALABAMA**, et al., Defendants-Appellants.

No. 84–7571.

United States Court of Appeals, Eleventh Circuit.

Sept. 24, 1985.

Rehearing and Rehearing En Banc Denied Oct. 28, 1985.

Robert C. Black, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, Ala., for defendants-appellants.

N. Gunter Guy, City Atty., Montgomery, Ala., for City of Montgomery.

Charles A. Graddick, Atty. Gen., Joseph G.L. Marston, III, Asst. Atty. Gen., Montgomery, Ala., for intervenors, State of Ala. and Atty. Gen. of Ala.

Ira A. Burnim, Dennis Charles Sweet, III, Montgomery, Ala., for plaintiff-appellee.

Before FAY and ANDERSON, Circuit Judges, and GIBSON\*, Senior Circuit Judge.

R. LANIER ANDERSON, III, Circuit Judge:

Appellant City of Montgomery (the "City") challenges a jury verdict in favor of appellee Darryl Pruitt ("Pruitt") on Pruitt's claim under 42 U.S.C.A. § 1983 that a Montgomery police officer's unconstitutional use of "deadly force" caused him severe and permanent physical injury. The district court held, based upon its earlier decision in *Ayler v. Hopper*, 532 F.Supp. 198 (M.D.Ala.1981), that the City's "deadly force" policy was unconstitutional as applied to the shooting of an unarmed fleeing burglary suspect. Finding no issue of disputed material fact on the question of the City's liability, the district court granted partial summary judgment to Pruitt. The court then submitted the issue of damages to the jury which came back with a $100,000 verdict in Pruitt's favor. We affirm.

## I. BACKGROUND

On the night of September 1, 1982, Pruitt, an 18-year old, and four of his friends were walking in a commercial district in downtown Montgomery, Alabama. Pruitt went to a wooded area behind an auto parts store located at 614 Fairview Avenue with one of his friends, a young woman, and had sexual intercourse with her. Meanwhile, a citizen who had heard noises behind the store reported to the police that a possible burglary was in progress.[1] Among the first two police offi-

---

\* Honorable Floyd R. Gibson, U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. The parties agree that the police officers who arrived on the scene had probable cause to believe that a burglary of the auto parts store, a felony under Alabama law, *see* Ala.Code §§ 13A–7–1—13A–7–7 (1982 & Supp.1984), had taken place. The parties also agree that no burglary in fact took place. Stipulation, Record, vol. II at 77. Pruitt was charged in city court with statutory rape, *see* Ala.Code § 13A–6–62. The grand jury, which was presented with evidence concerning the incident, declined to indict Pruitt. Stipulation, Record, vol. II at 77. The officers called to the scene of the reported burglary had no knowledge of any act of alleged burglary had no knowledge of any act of alleged

cers to respond to the reported burglary was Lester Kidd ("Kidd"). He arrived as a passenger in a police car driven by his senior officer. The senior officer dropped Kidd off at a street intersecting with Fairview Avenue about two doors from the auto parts store. The senior officer proceeded in the police car to the front of the store. Meanwhile, Kidd walked through a wooded area toward the rear of the store.

As Kidd approached the rear of the store, the senior officer informed Kidd by walkie-talkie that two suspects had been apprehended in front of the store. Kidd walked two or three steps further toward the rear of the store and then Pruitt came out from behind some bushes or brush, approached or "came at" Kidd (at which point Kidd and Pruitt were in close proximity to one another), and then took off running away from the back of the store through the woods. To summarize,[2] at this point Kidd yelled "halt, police" several times, Pruitt failed to heed Kidd's command, and Kidd fired his weapon at Pruitt. Kidd believed that this shot had not hit Pruitt, and he fired his shotgun a second time. This second shot hit Pruitt in the buttocks area. Pruitt's injuries required extensive medical treatment and hospitalization, and have resulted in permanent and serious injury to one of Pruitt's legs which has been described in expert testimony as paralysis.

In August 1983, Pruitt filed suit under 42 U.S.C.A. § 1983 against the City, Montgomery Mayor Emery Folmar, Chief of Police Charles Swindall, and Kidd, alleging violations of the Fourth, Fifth, and Four-

teenth Amendments. However, the only defendant before us on appeal is the City.[3] Pruitt also alleged pendent Alabama state claims of assault and battery, and negligence. On July 12, 1984, after presentation of affidavits and other evidence, and full briefing of the issues, the district court issued an order in response to the parties' cross-motions for summary judgment. First, relying on its prior holding in *Ayler v. Hopper*, 532 F.Supp. 198 (M.D.Ala.1981), the district court reiterated (1) "that the use of deadly force to stop a fleeing or escaping felon constitute[s] a civil rights violation actionable under § 1983 'unless the [state] official has good reason to believe that the use of such force is necessary to prevent imminent, or at least a substantial likelihood of, death or bodily harm,' " and (2) that *Ayler* had held the Alabama "fleeing felon" statute unconstitutional to the extent that it authorized the use of deadly force by police in other circumstances. District Court Order at 3–4, Record, vol. II at 92–93 (*quoting Ayler*, 532 F.Supp. at 201).

The district court then proceeded to grant partial summary judgment in favor of Pruitt under the standard set out in *Ayler*, concluding that no issue of material fact had been raised by the instant case. Based on Kidd's deposition testimony, the district court found that the sole reason Kidd shot Pruitt, a fleeing unarmed burglary suspect, was to prevent Pruitt from escaping, not because Pruitt posed a threat of death or bodily injury to Kidd or others. District Court Order at 4, Record, vol. II at 93.[4] The court, therefore, granted summa-

rape, statutory rape, or sexual intercourse prior to the shooting of Pruitt.

**2.** The events leading up to the shooting, as explained in Kidd's deposition, will be discussed in much greater detail in Part II.B., *infra*.

**3.** Pruitt's motion to dismiss defendants Fulmar and Swindall was filed on April 2, 1984, and granted by the district court three days later, leaving Kidd and the City as the only remaining defendants. *See* Record, vol. II at 55–57. Thereafter, at a pre-trial hearing on July 26, 1984, Pruitt dismissed Kidd from the § 1983 claim. *See* Record, vol. I at 5. The City is,

therefore, the only defendant left in the § 1983 claim, which is the only claim before this court on appeal. *See infra* note 6.

**4.** On July 26, 1984, the district court issued an order amending its earlier partial summary judgment order and substituting new language to the effect that Kidd had indicated in his deposition that he feared an attack by Pruitt when Pruitt first came out of the bushes but that his only concern at the time of the shooting was the effectuation of Pruitt's arrest. *See* Record, vol. II at 196; *see generally* Part II.B., *infra*.

ry judgment against the City and in favor of Pruitt on the issue of § 1983 liability only.[5]  In addition, the court found that the City was liable for Kidd's unconstitutional use of deadly force because Kidd had been acting pursuant to the City's deadly force policy (which itself was based upon the Alabama statute).[6]  *Id.* at 93; *see also* Kidd Deposition (hereafter cited as "K.Dep.") at 9–14.

The district court sent the § 1983 claim to the jury on the issue of damages and the jury returned a verdict for $100,000.  Pursuant to Fed.R.Civ.P. 54(b), the court entered final judgment for Pruitt against the City.  This appeal ensued.[7]

## II.  DISCUSSION

### A.  *Legal Standard*

On March 27, 1985, the United States Supreme Court decided the case of *Tennessee v. Garner*, —— U.S. ——, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).  In *Garner,* the Court considered the constitutional validity of the Tennessee "fleeing felon" statute which codified the common law rule that after a police officer gives a felony suspect notice of intention to arrest the officer "may use all necessary means to effect the arrest" if the suspect flees or forcibly resists.  Tenn.Code Ann. § 40–7–108 (1982); *see Garner,* —— U.S. at ——. & n. 5, 105

S.Ct. at 1698 & n. 5, 85 L.Ed.2d at 5 & n. 5.  The evidence produced at trial in *Garner* indicated that a Memphis police officer shot and killed an unarmed, fleeing burglary suspect in order to apprehend him.

First, the Supreme Court held that the shooting itself was a "seizure" within the meaning of the Fourth Amendment and was thus subject to that amendment's "reasonableness" requirement.  *Id.* at ——, 105 S.Ct. at 1699, 85 L.Ed.2d at 7.  Second, the Court held that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable....  Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failure to apprehend him does not justify the use of deadly force to do so....  The Tennessee statute is unconstitutional insofar as it authorizes the use of deadly force against such fleeing suspects."  *Id.* at —— – ——, 105 S.Ct. at 1700–1701, 85 L.Ed.2d at 9–10.  The Court continued:

> It is not, however, unconstitutional on its face.  Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.  Thus, if the suspect threatens the officer with a weapon

---

**5.**  The district court, of course, denied the defendants' motion for summary judgment.  District Court Order at 5, Record, vol. II at 94.

**6.**  *See Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  There was no real dispute over the fact that Kidd was acting pursuant to the City's deadly force policy, and the City does not appeal the district court's finding under *Monell* that "Pruitt's shooting was merely an execution of this policy."  District Court Order at 4, Record, vol. II at 93.  If an officer acts pursuant to City policy, the City can be held liable for damages despite the officer's "good faith" execution of that policy.  *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

The district court recognized, on the other hand, that the issue of Kidd's qualified "good faith" immunity, *see Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), complicated the issue of liability as to Kidd.  The district court further noted that it had been

informed by Pruitt that he might dismiss Kidd from the case if the City were found liable.  The court, thus, declined to reach the issue of Kidd's liability "at this time."  District Court Order at 5, Record, vol. II at 94.  The court similarly declined to address Pruitt's pendent state claims.  *Id.*  Thereafter, Pruitt did in fact dismiss Kidd from the § 1983 claim.  *See supra* note 3.

**7.**  This court granted the State of Alabama intervenor status only on the issue of the constitutionality of the "fleeing felon" statute.  The state filed a brief and presented oral argument.  Just prior to oral argument, Pruitt moved to dismiss the state in light of the United States Supreme Court's decision in *Tennessee v. Garner,* —— U.S. ——, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).  The motion was carried with the case.  In light of our disposition of the case, Pruitt's motion to dismiss the state as intervenor is DENIED as moot.

or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given. As applied in such circumstances, the Tennessee statute would pass constitutional muster.

*Id.* at ——, 105 S.Ct. at 1701, 85 L.Ed.2d at 10.

Finally, the Court applied the above-described rule to the facts before it, and found "the statute unconstitutional insofar as it purported to give [the officer] the

authority to act as he did...." *Id.* at ——, 105 S.Ct. at 1706, 85 L.Ed.2d at 16.

As the parties agree, the Alabama "fleeing felon" statute also attempts to preserve the common law rule, *Garner,* —— U.S. at —— n. 14, 105 S.Ct. at 1703 n. 14, 85 L.Ed.2d at 12 n. 14, and is, therefore, under *Garner,*[8] subject to both constitutional and unconstitutional applications.[9] *Accord, Acoff v. Abston,* 762 F.2d 1543, 1547 (11th Cir.1985).

■ We turn, then, to the question whether, under the standard set out in *Garner,* the district court's grant of summary judgment in favor of Pruitt was proper.[10]

---

**8.** We note that the prior ruling by Judge Myron H. Thompson in *Ayler v. Hopper,* 532 F.Supp. 198 (M.D.Ala.1981), set a standard by which the constitutional validity of the Alabama statute could be assessed which is strikingly similar to the one adopted in *Garner.* The district court is to be commended for its accurate analysis of the emerging constitutional standard in this difficult area.

**9.** The Alabama "fleeing felon" statute provides, in relevant part:

A peace officer is justified in using deadly force upon another person when and to the extent that he reasonably believes it necessary in order:
(1) To make an arrest for a felony or to prevent escape from custody of a person arrested for a felony....

Ala.Code § 13A–3–27(b)(1) (1982). The deadly force policy of the Montgomery Police Department incorporates the common law rule as expressed in the statute, *see* Plaintiff's Exhibit No. 5, *Montgomery Police Departmental Manual 531* § 2.500; K.Dep. at 10–12; *see generally* Deposition of Charles Swindall; and, as we have indicated, Kidd was acting pursuant to that policy when he shot Pruitt. *See supra* note 6. The only question, then, is whether Kidd's actions violated the rule in *Garner.*

**10.** Although not precisely delineated on appeal as an issue requiring reversal, the City also argues that the shooting in this case did not, as a matter of law, constitute "deadly force" because Kidd had not tried to kill Pruitt but, rather, only shot to stop him by hitting his legs. *See* K.Dep. at 15, 20, 83. The State of Alabama, which was granted intervenor status by this court only on the issue of the constitutionality of the "fleeing felon" statute, also pressed this issue at oral argument. We reject this argument as did the district court. *See* District Court Order at 3 n. 1, Record, vol. II at 92.

The City does not argue, nor could it, that "deadly force" occurs only when the victim actually dies. *See Acoff v. Abston,* 762 F.2d 1543 (11th Cir.1985) (*Garner* applicable where victim was paralyzed). The City points to language in *Garner* which, when taken in isolation, might suggest that the use of deadly force occurs only when an officer shoots to kill. *Garner,* —— U.S. at ——, ——, ——, 105 S.Ct. at 1699, 1700, 1701, 85 L.Ed.2d at 8, 9, 10. A close analysis, however, makes clear that although the Court held that "[a] police officer may not seize an unarmed, non-dangerous suspect by shooting him dead," *id.* at ——, 105 S.Ct. at 1701, 85 L.Ed.2d at 10, the Court's prohibition extends more generally to the "*use* of deadly force" in such circumstances. *Id.* at ——, ——, ——, ——, ——, ——, ——, 105 S.Ct. at 1699, 1700, 1701, 1703, 1704, 1705, 1706, 85 L.Ed.2d at 8, 9, 10, 12, 13, 14, 15; *see also id.* at ——, 105 S.Ct. at 1705, 85 L.Ed.2d at 15 (citing with approval amicus brief of the Police Foundation to the effect that "the obvious state interests in apprehension are not sufficiently served to warrant the use of lethal weapons against all fleeing felons ...").

The Model Penal Code, which recommends abandonment of the common law rule and whose "deadly force" rule the *Garner* Court adopted in large part, *see* —— U.S. at —— n. 4, 1698 n. 4, 85 L.Ed.2d at 6 n. 4, defines "deadly force" as follows:

force which the actor uses with the purpose of causing· or which he knows to create a substantial risk of causing death or serious bodily harm. Purposely firing a firearm in the direction of another person or at a vehicle in which another person is believed to be constitutes deadly force.

Model Penal Code § 3.11(2) (1962); *see also Mattis v. Schnarr,* 547 F.2d 1007, 1009 n. 2 (8th Cir.1976) (en banc) (adopting Model Penal Code definition), *vacated as moot sub nom., Ashcroft v. Mattis,* 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977); Ala.Code § 13A–3–20(2) (1982)

## B. *Summary Judgment*

Although the pre-trial depositions of both Kidd and Pruitt were presented to the district court, the City has only placed Kidd's deposition in the record on appeal. We now review that deposition in detail, quoting from it liberally, to determine whether Kidd "had probable cause to believe that [Pruitt] pose[d] a threat of serious physical harm to the officers or to others." *Garner*, —— U.S. at ——, 105 S.Ct. at 1701, 85 L.Ed.2d at 10.

Early in his deposition, Kidd gave the following description of the incident which ensued as he approached the back of the auto parts store:

I had the shotgun. After I flipped [my flashlight] back down I took the shotgun back into my hand. I was going at low port. I took about three steps and then the subject came out of the bushes. He came at me and I went up with my shotgun at high port, and once I went up at high port the subject veered to the right and then when he veered then I yelled "halt, police". At this time I was thinking this was the third subject that was involved in the burglary coming from the back. I knew the subject had to have been looking at me because I didn't hear anything until I more or less ran up on this bush. When I got too close he jumped out.

As soon as I said halt the first time— the subject came at me and veered off to the right. I said "halt, police". The subject kept running. I yelled "halt, police" again. At that time I could hear [the police car's] tires screeching and they were coming out down around the back. Then I yelled a third time and the subject went down into a ditch. And when he came up out of the ditch I had

to make a decision whether I was going to stop this fleeing felon or what I was going to do.

I could see the subject's legs and body, his complete body, because it was silhouetted and he had a white shirt and white tennis shoes. I could tell that. I shot at the subject's legs to stop him. And I shot the first round and the subject kept moving, and I shot the second round and the subject kept going, and maybe two or three seconds later I heard the subject yell and he fell.

K.Dep. at 19–20.

There are conflicts in the deposition as to the manner in which Pruitt emerged from the bushes. In the above-quoted description he "came out of the bushes," "came at me," and "jumped out." At another point, Kidd stated that Pruitt "took about three steps" toward him when he came out of the bushes. *Id.* at 39. At still another point, Kidd reasoned that he must have walked in Pruitt's path and "boxed him in." *Id.* at 42.

At several points in the deposition, Kidd indicated that he was momentarily put in fear by Pruitt's emergence from the bush in Kidd's direction. Kidd stated that he thought Pruitt was trying to hit him or knock him down or "tangle" with him. *Id.* at 35–36. However, Kidd stated, "[t]he subject I guess saw that I had responded to him coming at me, then he ran off." *Id.* at 36. Kidd also stated that "I felt that the subject was trying to harm my physically which means if he's trying to harm me physically and I also have a shotgun and another weapon on my side he could easily get them and kill me. Once he did that, that also prompted me to think about shooting the subject to stop him." *Id.* at

("Force which, under the circumstances in which it is used, is readily capable of causing death or serious physical injury"). The above-quoted definitions clearly encompass Kidd's actions in shooting Pruitt; Kidd, at the least, purposely fired his shots at Pruitt's legs, and in doing so used force capable of causing serious physical injury.

We find such action a "use of deadly force" in the constitutional sense, concluding that such

finding is consistent with *Garner*. *See Garner*, —— U.S. at ——, 105 S.Ct. at 1705, 85 L.Ed.2d at 15; *id.* at —— – ——, 105 S.Ct. at 1711–1712, 85 L.Ed.2d at 22–23 (O'Connor, J., dissenting) (decrying the majority's failure to narrowly define "use of deadly force" and attempting to limit such definition to the *shooting* of an unarmed, non-dangerous burglary suspect).

83; *see also id.* at 40 (indicating that Kidd thought Pruitt was dangerous when Pruitt came at him out of the bushes in that Kidd believed that Pruitt might knock him down and take the two weapons he was carrying).

At several points in his deposition, Kidd described in detail the sequence of events from the point at which Pruitt emerged from the bushes and when he was shot. When Pruitt came out of the bushes, he was 7–10 feet away from Kidd. *Id.* at 33. Then, Pruitt "took about three steps ...," at which point he was very close to Kidd. *Id.* at 39. Pruitt then "veered off to the right." *Id.* At this point, Kidd took four or five steps to go after him but realized he couldn't catch him. Kidd stated that Pruitt "went off like he was O.J. Simpson and kept running." *Id.; see also id.* at 36 ("When he ran off he was just running. I don't know whether he knew exactly where the path was through there or what. He was just running").

Kidd's deposition describes that Pruitt ran off into a wooded area down into a ditch, where apparently Kidd lost sight of Pruitt temporarily, and then back up out of the ditch. *Id.* at 34. At this point Kidd yelled at Pruitt two or three times. *Id.*[11] Pruitt kept running. Kidd shot at Pruitt once. Pruitt continued to run.[12] Kidd fired again. According to Kidd's deposition, Pruitt continued to run for a few seconds more, and then he fell to the ground. *Id.* at 44.

Kidd also testified as to his reasons for shooting Pruitt. Kidd testified:

I thought the subject had broken in and tried to get away and so forth so I thought for certain that the subject had broken into the building or was trying to get away and I decided, I had to make a decision whether I was going to stop the subject or just let the subject go.... I didn't know where I was going exactly back there. That's when I knew for a fact there was no way I was going to run the subject down because he was familiar—from the way he was going and as fast as he was going he knew exactly where the trail was and how he was going to get out of there.... I took the initial two or three steps there and looked and there was nothing I could do as far as running. I couldn't run the subject down. I had to make a decision whether to stop him or let him go.

*Id.* at 38, 39–40. Kidd further testified, with respect to why he took the action that he did rather than radioing for police assistance:

I still could not have gotten to the radio if I had to make a decision whether I was going to shoot the subject or not to stop him by gunfire. I had made my decision once I initially ran those few steps and saw that I was not going to catch up with this subject. That's when I had to make the decision whether to fire or not to fire. If I had of gone for the radio then without a doubt the subject would have gone.

*Id.* at 52–53.

Finally, the deposition concluded with the following colloquy between Pruitt's counsel and Kidd:

Q. Now, on that evening when you shot Darryl Pruitt, was it necessary to shoot him in order to arrest him?

A. It was necessary to shoot him in my thinking, in my judgment in order to stop that subject.

Q. When you say stopped you mean arrest?

---

**11.** This must be a reference to Kidd's "halt, police" order. Earlier in the deposition, Kidd stated that he yelled "halt, police" once when Pruitt first emerged from the bush and three times right before he went down into the ditch. K.Dep. at 19–20. As indicated in the text, Kidd stated later in his deposition that the "halt, police" commands were issued after Pruitt came back out of the ditch and that he was not sure exactly how many times he gave the command. In any event, this discrepancy is unimportant.

**12.** Apparently, Pruitt claimed on deposition that this first shotgun blast hit him, spraying him with ammunition on his back and arm. Kidd was under the impression, however, that the first shot did not hit Pruitt.

A. All right. Arrest is one thing you understand. The subject is going to be placed under arrest but first I've got to get the subject and to place him under arrest. In order to have stopped that subject that night I had to shoot him. Once I stopped the subject I would place the subject under arrest for whatever crime was committed.

. . . . .

Q. When you shot Darryl Pruitt did you think he was about to kill or seriously harm yourself or some other person?

A. When I shot Darryl Pruitt my thoughts were not as far as trying to harm another person but myself when the subject *initially* came at me. I felt that the subject was trying to harm me physically which means if he's trying to harm me physically and I also have a shotgun and another weapon on my side he could easily get them and kill me. Once he did that, that also prompted me to think about shooting the subject to stop him. I never at any time really thought about killing Darryl Pruitt. I wanted to stop him. I was trying to aim for the subject's legs at the time. I yelled out at the subject three times and he never stopped so I had to make a decision.

Q. Listen to the question this time if you would. When you shot Darryl Pruitt did you think he was about to kill or seriously harm you or some other person?

A. Yes.

Q. Was it you you thought he was about to harm or kill?

A. When I shot him that thought *had already gone through*. When I initially shot him I thought that he had already burglarized the place plus he had the thought of harming me. That's the reason I shot him. As far as what you're saying, as far as immediately when I shot him. right then was he going to harm me, *no, because he was running at the time*. But see, other incidents led up to him being shot by me.

Q. Are you saying then that you shot him because you thought before he had tried to hurt you?

A. No, that's not what I'm saying. That's one factor in me making the decision of shooting him.

Q. So is it correct then that the time you shot Darryl Pruitt you didn't think he was about to kill or harm some other person?

A. No. At the time that I shot Darryl Pruitt my thinking was that he was a fleeing felon coming from a burglary; that he also had made an attempt to physically harm a police officer but *he avoided that attempt* and he was a subject that I felt needed to be stopped.

Q. Is it also true then at the time you shot Darryl Pruitt you didn't think he was about to kill or harm you?

A. *No. As far as [at] that point, no.*
*Id.* at 82–85 (emphasis added).

■ We recognize that in reviewing the district court's grant of summary judgment we must construe the evidence and all reasonable inferences therefrom in the light most favorable to the City, and must resolve all doubts in its favor, since it is the nonmoving party. *See Warrior Tombigbee Transportation Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296–97 (11th Cir.1983). The question is whether, as a matter of law, Kidd's deposition testimony when construed in this manner indicates that Kidd engaged in an unconstitutional use of deadly force. In doing so, we look to the standard which was announced in *Garner.*

Our court has very recently delineated the *Garner* standard as follows:

The *Garner* standard contains three elements. First, an officer must have probable cause to believe that the suspect poses a threat of serious physical harm to the officer or to others. Probable cause of this sort exists where the suspect actually threatens the officer with a weapon or where there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm. Second, deadly force must be

necessary to prevent escape. Third, the officer must give some warning regarding the possible use of deadly force whenever feasible.

*Acoff*, 762 F.2d at 1547.[13] It is clear from our review of the Kidd deposition that Kidd's use of deadly force is unconstitutional under the first element described above.[14]

First, there could be no argument on this record that Kidd had probable cause to believe that Pruitt was a threat to others. Kidd's deposition indicates that he had no such belief. K.Dep. at 83 ("my thoughts were not as far as [Pruitt] trying to harm another person ..."); *Id.* at 84 ("Q. So is it correct then that the time you shot Darryl Pruitt you didn't think he was about to kill or harm some other person? A. No. At the time I shot Darryl Pruitt my thinking was that he was a fleeing felon coming from a burglary ...").

Second, there is simply no credible evidence that Kidd felt in the least bit threatened by Pruitt *at the time of the shooting*. Our review of Kidd's testimony indicates that after Pruitt came out of the bushes, he veered off from Kidd and ran away very quickly. After this, Kidd began to give chase, then stopped, then lost sight of Pruitt, and then yelled several warnings before firing two shots, all unmistakably indicating that Pruitt was a good distance away from Kidd with his back toward Kidd at the time of the shooting. Kidd's testimony repeatedly indicates that his concern at this point was to stop Pruitt because he was a fleeing burglary suspect. *See* Record, vol. II at 196 (Order amending district court's Summary Judgment Order) ("Although Kidd testified that he initially feared an attack from Pruitt, his deposition testimony repeatedly indicates that Kidd's own subjective concern was for effecting Pruitt's arrest and not for his own or another's safety").

The City points to the fact that Pruitt answered "yes" to the question whether he thought when he shot Pruitt that Pruitt was about to harm or kill him or someone else. *See* K.Dep. at 83. However, Kidd's prior and subsequent answers make clear that Kidd misunderstood this question. These other answers indicate unambiguously that Kidd's subjective fear had already passed, *see e.g.,* K.Dep. at 40, 82, 83, 84, and that his only purpose in shooting was to stop Pruitt. Moreover, even if Kidd had some subjective fear of Pruitt at the time he shot him, such fear would be patently unreasonable given the facts testified to by Kidd, and, thus, would hardly have presented a disputed issue of material fact under *Garner*'s "probable cause" standard. *See Garner,* — U.S. at — – —, 105 S.Ct. at 1700–01, 85 L.Ed.2d at 9–10 ("Where the suspect poses no *immediate* threat to the officers or to others, the harm from failing to apprehend him does not justify the use of deadly force to do so") (emphasis added); *cf. id.* at —, 105 S.Ct. at 1705, 85 L.Ed.2d at 15 (although officer was not certain that suspect was unarmed, "[r]estated in Fourth Amendment terms, this means [the officer] had no articulable basis to think Garner was armed"); *United States v. Tinkle,* 655 F.2d 617, 621 (5th Cir. Unit A Sept. 8, 1981) ("The definition of probable cause [to stop and arrest] is easily stated: probable cause exists whenever the facts and circumstances known to the offi-

---

**13.** Although the City does not question the retroactive effect of *Garner,* the *Acoff* court held that the *Garner* decision will be applied retroactively. *See Acoff,* 762 F.2d at 1548–49.

**14.** *Garner* and *Acoff* contain a possible implication that probable cause to believe that the suspect poses a serious physical threat to the person of the police officer exists *only* where the officer is threatened with a weapon. Of course, there was no weapon in this case. *Cf. infra* note 17. Assuming, however, that such probable cause can exist without an armed threat by the suspect, we doubt seriously whether Kidd's subjective fear, caused by Pruitt's coming at him momentarily, could constitute probable cause to believe that Pruitt posed a threat of serious physical harm to Kidd. However, we need not decide in the instant case whether a threat with a weapon is necessary, or even if not, whether Kidd's subjective fear at the earlier time was sufficient, because at the time of the shooting, with Pruitt fleeing away from Kidd, any alleged subjective fear of physical harm to Kidd had already passed. *See* discussion in text *infra.*

cer, and of which he has reasonably trustworthy information, are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed").[15]

We turn briefly to the second half of the first element of the *Garner* test, *i.e.*, whether "there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm." *Acoff, supra*, at 1547. There simply is no evidence that Kidd had such probable cause. All Kidd reasonably believed was that a burglary had taken place, and that Pruitt was fleeing from it. His deposition indicates that one reason he felt Pruitt was dangerous was that he was "a felon coming out of a building." K.Dep. at 40. However, the essential meaning of *Garner*—that a police officer may not shoot at a suspect simply because he is a fleeing felon—undermines any reliance on this statement as indicative of probable cause that a crime involving the infliction or threatened infliction of serious physical harm had taken place.[16] Finally, there is no evidence that Kidd believed, reasonably or otherwise, that Pruitt was armed, a factor which might indicate that the suspect had committed a crime involving the infliction or threatened infliction of serious physical harm.[17] *Compare Garner,* —— U.S. at ——, 105 S.Ct. at 1705, 85 L.Ed.2d at 15 (no articulable reason to believe that the suspect was armed).

We readily conclude that there is no genuine issue of fact material to the question whether Kidd had probable cause to believe that Pruitt posed a physical threat to himself or to others, or material to the question whether Kidd had probable cause to believe that Pruitt had committed a crime involving the infliction or threatened infliction of serious physical harm. Therefore, Pruitt was entitled to summary judgment as a matter of law. That being the case, we need not reach the second and third elements of the *Garner* test, *i.e.*, whether the use of deadly force was necessary to prevent escape, and whether the officer gave "some warning regarding the possible use of deadly force [if] feasible".[18] *Acoff*, 762 F.2d at 1547.

## III. CONCLUSION

In light of the foregoing, the decision of the district court is

AFFIRMED.[19]

---

**15.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

**16.** In this regard, it is interesting to note that *Garner* involved the nighttime burglary of a dwelling, a crime more likely to involve violence or threatened violence against the person than the suspected crime in this case, *i.e.*, the nighttime burglary of a closed commercial establishment. *See Garner,* —— U.S. at ——, 105 S.Ct. at 1709–11, 85 L.Ed.2d at 19–21 (O'Connor, J., dissenting).

**17.** Pruitt had no weapon. Moreover, Kidd never mentioned that he believed Pruitt to be armed. In fact, his deposition indicates to the contrary. Kidd stated that he saw Pruitt fairly well from close range, *see e.g.*, K.Dep. at 33 (detailed description of Pruitt's clothing), that he had a good view of Pruitt while running, *id.* at 34, and that he did not notice Pruitt in possession of any burglary tools when Pruitt approached him. *Id.*

at 38. Finally, Kidd stated that he feared that Pruitt would attack him and take *his* weapons and use them against him, indicating that Kidd believed Pruitt to be *unarmed. Id.* at 40.

**18.** Pruitt argues that summary judgment is required on this third element because Kidd should have warned "halt, or I'll shoot" instead of "halt, police," indicating both that a warning was feasible and that the warning actually used did not advise of "the possible use of deadly force." We note that *Garner* refers to "some warning" rather than "some warning regarding the possible use of deadly force." *Acoff*, 762 F.2d at 1547. Because of our disposition of the case, we decline to decide whether such warning was feasible or if the term "halt, police" was sufficient under *Acoff.*

**19.** The City makes one final argument which warrants only brief discussion. The City claims that the district court was without jurisdiction to hear Pruitt's § 1983 claim because there was an "adequate" state remedy under *Hudson v. Palmer,* —— U.S. ——, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), and *Parratt v. Taylor,* 451 U.S. 527,

101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). As we have stated on numerous occasions, this argument is devoid of merit. *See Hall v. Sutton,* 755 F.2d 786, 787–88 (11th Cir.1985) (*Parratt* does not bar claim that prison officials retaliated against prisoner for assertion of constitutional right of access to the courts); *Cate v. Oldham,* 707 F.2d 1176, 1188 n. 9 (11th Cir.1983) (*Parratt* does not bar First Amendment claim); *Duncan v. Poythress,* 657 F.2d 691, 704–05 (5th Cir. Unit B Sept. 28, 1981) (*Parratt* does not bar *substantive* due process claim that state officials disenfranchised state electorate in violation of state law), *cert. granted,* 455 U.S. 937, 102 S.Ct. 1426, 71 L.Ed.2d 647 (1982), *cert. dismissed,* 459 U.S. 1012, 103 S.Ct. 368, 74 L.Ed.2d 504 (1982); *cf. Lewis v. Hillsborough Transit Authority,* 726 F.2d 668 (11th Cir.) (on rehearing), *cert. denied,* —— U.S. ——, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). Thus, it is clear that the rationale of *Hudson* and *Parratt* does not apply to alleged violations of substantive constitutional rights, such as the Fourth Amendment rights implicated here. *See Hudson,* —— U.S. at ——, n. 4, 104 S.Ct. at 3207, n. 4, 82 L.Ed.2d at 412 n. 4 ("[T]he Court's holding [does not] apply to conduct that violates a substantive constitutional right—actions governmental officials may not take no matter what procedural protections accompany them") (Stevens, J., concurring in relevant part).