[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-10614
Non-Argument Calendar
_____

D.C. Docket No. 9:14-cv-80403-DTKH


LYDIA ADAMS,
as personal representative of the estate of Seth Adams,
for the benefit of Lydia Adams,
RICHARD ADAMS,
surviving parent,
SETH ADAMS,
the estate,

                                                        Plaintiffs - Appellees,

versus

SHERIFF OF PALM BEACH COUNTY, FLORIDA,
Ric L. Bradshaw, in his official capacity,

                                                        Defendant,

MICHAEL M. CUSTER,
in his individual capacity,

                                                        Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(November 22, 2016)

Before MARTIN, JULIE CARNES, and ANDERSON, Circuit Judges.

PER CURIAM:

On the night of May 16, 2012, Defendant Michael Custer, while conducting an undercover surveillance operation for the Palm Beach County Sheriff's Office, parked his unmarked police vehicle in the parking lot of a plant nursery. Seth Adams, an employee of the nursery who resided on the premises, confronted Custer about his presence there. Custer fatally shot Adams after an alleged scuffle. Plaintiff Lydia Adams ("Plaintiff"), Seth's mother, sued Custer in his individual capacity under 42 U.S.C § 1983, alleging that he violated Adams' Fourth Amendment rights by using excessive force against Adams. Custer asserted qualified immunity as a defense and moved for summary judgment. The district court denied Custer's motion, and this appeal followed. Finding that there is a genuine dispute of material fact regarding the circumstances of the shooting, we **AFFIRM** the district court's denial of summary judgment.

2

## I. BACKGROUND

### A.    Factual Background

There are two versions of the facts in this case.  Before the district court, Defendant offered a specific chronological recitation of the events that led to his shooting Adams.  Plaintiff is unable to offer, with any specificity, a differing summary of the events because the only other eyewitness to the shooting was the victim of that shooting, Seth Adams, and he is dead.  Nonetheless, Plaintiff disagrees that the events could have occurred as Defendant described them, and she produced forensic evidence as well as the testimony of other witnesses that call into question the truthfulness of Defendant's explanation.  We set out first the Defendant's version of the facts.  Then, we set out the evidence offered by Plaintiff that contradicts Defendant's testimony, along with the impact of that evidence on the credibility of Defendant's account.

At the time of the incident giving rise to this case, Defendant Michael Custer ("Defendant") was a sergeant with the Palm Beach County Sheriff's Office (PBSO).  He was assigned to PBSO's Tactical Unit (TAC), where his responsibilities included performing undercover surveillance operations.  On the night of the shooting, he was on duty participating in such an operation.  Due to the nature of the operation, Defendant was driving an unmarked police SUV and dressed in plain clothes.  Although he was wearing a TAC tee-shirt under his plain

3

gray button-up shirt and a badge clipped to his belt, Defendant wore his button-up shirt untucked, which may have concealed the badge on his belt during his encounter with Adams.

Seth Adams was an employee of A One Stop Garden Shop, which owned the parking lot where the shooting happened. Adams also lived on the premises in a residence behind the nursery, which was adjacent to the parking lot. That night, Adams was wearing a work shirt with A One Stop Garden Shop's company logo on the front and back.

Shortly after 11:00 p.m., Defendant backed his vehicle into the parking lot of A One Stop Garden Shop, which was closed. A sign that read "NO PARKING 6 PM TO 6 AM VEHICLES WILL BE TOWED" was posted in the parking lot, though Defendant claims to not have seen the sign. Defendant chose this parking spot to take advantage of the darkness there, and remained in his vehicle with the engine running and the lights off.

Around 11:40 p.m., Seth Adams drove his pickup truck into the parking lot and parked parallel to Defendant's vehicle, facing the other direction. The two drivers faced each other from 10 to 15 feet away, each now with his window down. Defendant stated that Adams immediately began "screaming" and demanding, "Who the f*** are you? What the f*** are you doing here?" Defendant identified himself as a law enforcement officer and showed Adams his ID, but Adams exited

4

his vehicle empty-handed and rapidly approached Defendant's vehicle. Defendant then exited his vehicle and tried again to show his ID to Adams and explain his presence there. Defendant did not use any device to illuminate his ID, and both he and Adams were behind the headlights of Adams' truck.

Defendant claims that Adams "sat there listening to [him]" for a "couple of seconds," but then suddenly grabbed Defendant by the throat. Defendant says he broke free from Adams' grip on his neck, although the two continued to grapple briefly. Defendant was finally able to extricate himself after hitting Adams with a chest strike, which created some space between himself and Adams. Defendant then drew his firearm, pointed it at Adams, and ordered him to the ground, declaring Adams to be under arrest. Adams, still empty-handed, did not heed the instructions, but walked back and forth in front of Defendant, "hovering" about five feet away. Defendant backed towards his vehicle to retrieve a radio from the front seat, which he used to request backup. The standoff continued, and Adams then ran towards the open door of his truck, not heeding Defendant's orders to stop, to stay away from the truck, and to get on the ground. Defendant then kicked the open door of Adams' truck shut, pinning Adams between the door and the vehicle's frame.

The two struggled there briefly. In the statement in which he first recounted the "pinning" incident, Defendant said he held Adams pinned in the door frame

5

while Adams was "moving around . . . trying to get out of the door" and screaming profanities "the whole time." Defendant said he perceived that Adams "was trying to get a weapon," and was "convinced he had obtained a weapon" when he "saw [Adams'] arms coming around." Defendant then fired four rounds at Adams.

In a later statement, Defendant elaborated on the above account, claiming he saw Adams "fishing around" the interior of the truck while he was pinned in the doorframe. In this account, Defendant says he held his firearm in his left hand as he wrapped his right arm around Adams' head and neck in an effort to pull Adams away from the truck. Adams suddenly yelled, "F*** you, as loud as he could, and came spinning out of the truck." At this point, Defendant says he fired his first shot, and then fired three more as he backed away from Adams.

In short, the account offered by Defendant indicates that prior to the shooting, a profane and angry Adams had struggled violently with Defendant and tried to choke Defendant around the neck. Running away from Defendant, Adams tried to get into his truck. Defendant blocked his exit from the truck, pinning Adams inside the truck with the truck's door pressed against him. But Adams, who appeared to be making an effort to obtain a weapon inside the truck, suddenly spun out of the truck and toward Defendant, who was standing at the truck's door, and loudly shouted F*** you. At that point, fearing for his life, Defendant shot Adams. Adams died two hours later.

6

Plaintiff disputes the truthfulness of Defendant's account and offered evidence that the district court concluded to have contradicted and substantially undermined Defendant's account of the events. First, Defendant stated that Adams had grabbed Defendant's neck and throat "as hard as a man can grab you." Yet, there was no redness or bruising on Defendant's neck. Nor did the DNA swab conclusively reveal any DNA from Adams.

Key to Defendant's ultimate explanation for shooting Adams was his assertion that Adams had made his way back to his truck at the point at which he spun back on Defendant, standing right next to the door of the truck. As noted, Defendant thought Adams might have gotten hold of a gun inside the truck. Yet, as pointed out in the district court's order, Plaintiff produced forensic evidence supporting a conclusion that Adams was actually shot, not inside or near the open door of the truck, but instead as he was standing at the rear of the truck. From this the district court concluded: "[Defendant's'] claim that he fired his first shot after Adams—standing pinned between the driver's side door and vehicle frame . . .— suddenly broke free from [Defendant's] chokehold and spun around shouting obscenities, is thus at complete odds with forensic, blood, and ballistic evidence . . . ."

Further undermining the credibility of Defendant's statement regarding the above incident as the event precipitating Defendant's decision to shoot is the fact

7

that Defendant failed to mention this event immediately after the shooting, instead explaining that he shot Adams because the latter tried to choke Defendant. It was only in a later account given in the presence of his attorney that Defendant mentioned this second incident inside Adams' truck. Further, critical to the accuracy of Defendant's recounting of the above conduct by Adams is the fact that Adams was allegedly pinned inside his truck with its door open. Yet, investigation immediately after the shooting showed the door of the truck to be closed.

As to one more detail in Defendant's first description of the initial encounter, Defendant stated that Adams had been hostile and aggressive from the outset and that after Defendant identified himself as a law enforcement officer, Adams kept screaming and "acting like a lunatic." But another law enforcement officer from Defendant's team had been driving by and observed the initial encounter between Defendant and Adams. This officer, Agent Drummond, indicated that he saw Defendant get out of his vehicle, while Adams was standing between the two vehicles, and it appeared that Defendant was talking to Adams, with nothing appearing to be wrong. Less than 90 seconds later, Agent Drummond heard on his radio another agent broadcast a warning that shots had been heard in the area, and moments later he heard Defendant's call for back-up. However, according to Custer, he had initially called for back-up before any shots were fired,

8

and had later issued a second call for back-up in which he noted that he had shot a man who had attacked him.

Taking the above evidence proffered by Plaintiff in the light most favorable to Plaintiff, the district court concluded that one could infer that Adams was not shot as described by Defendant (that is, there was no effort by Adams to choke Defendant and no assault initiated by Adams from inside his truck), but instead that he was shot at the back of his truck by Defendant, who had no reason to believe that Adams was armed or otherwise posed any danger.

## B.    Procedural History

Plaintiff sued both Ric Bradshaw in his official capacity as Sheriff of Palm Beach County and Defendant in his individual capacity under 42 U.S.C. § 1983. Plaintiff alleged that Defendant violated Adams' Fourth Amendment rights by shooting him, and his Fourteenth Amendment due process rights by failing to administer first aid afterwards. Sheriff Bradshaw was sued under a *Monell* theory of supervisory liability. Plaintiff also brought wrongful death claims against both defendants under Florida state law.

The district court granted summary judgment in favor of Defendant on the due process claim and Bradshaw on the supervisory liability claim, and partial summary judgment for both defendants on the state law wrongful death claim. The district court denied Defendant's motion for summary judgement on qualified

immunity grounds for the Fourth Amendment claim.  Defendant appeals the district court's denial of his motion.

## II.  DISCUSSION

### A.    Jurisdiction

As a preliminary matter, Plaintiff argues that this Court lacks jurisdiction to consider Defendant's appeal because the appeal merely challenges the district court's determination that material facts are genuinely in dispute.  While it is true that an interlocutory appeal is not available for such a challenge, *see Moniz v. City of Fort Lauderdale*, 145 F.3d 1278, 1280 (11th Cir. 1998), Plaintiff mischaracterizes Defendant's appeal.  Defendant contends on appeal that his actions did not violate a clearly-established constitutional right.  This contention raises legal issues, giving us jurisdiction to hear an interlocutory appeal.  *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014).  In addition, we have jurisdiction to hear "those evidentiary sufficiency issues that are part and parcel of the core qualified immunity issues, i.e., the legal issues." *Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996) (internal footnote omitted).  In sum, we have jurisdiction over this appeal because it raises the legal question of whether, after construing facts in favor of Plaintiff, Defendant violated clearly established constitutional law.  *Id.* at 1485 (noting the Court's interlocutory jurisdiction "in qualified immunity cases where the denial is based even in part on a disputed issue of law").

**B.    Standard of Review**

We review *de novo* a district court's disposition of a summary judgment motion based on qualified immunity and apply the same legal standards as the district court. *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003). We resolve any factual disputes in the plaintiff's favor and then decide whether that version of the facts entitles the defendant to qualified immunity. *Id.*; *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) ("Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant . . . ."). Consequently, the "'facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.'" *McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002), and *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000)). Nevertheless, we view the facts from the plaintiff's perspective because the determinative issue on appeal is "not which facts the parties might be able to prove," but whether "certain given facts" demonstrate a violation of clearly established law. *Crenshaw v. Lister*, 556 F.3d 1283, 1289 (11th Cir. 2009).

**C.    Whether Defendant Was Entitled to Qualified Immunity**

1.    Standard

Qualified immunity completely "protects government officials performing discretionary functions from suits in their individual capacities unless their conduct

11

violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). To obtain qualified immunity, a public official must first show that he was engaged in a discretionary duty when the allegedly wrongful act occurred. *Id.* at 995. Here, there is no dispute that Defendant was acting within his discretionary authority when he shot Adams. The burden thus shifts to Plaintiff to show that qualified immunity is not appropriate. *Id.*

Plaintiff must satisfy a two-part test to meet her burden. *McCullough*, 559 F.3d at 1205. First, she must show that Defendant's conduct violated a constitutional right. *Id.* Assuming a violation occurred, Plaintiff must also show that the right was clearly established at the time of the incident. *Id.* Viewing the facts in the light most favorable to Plaintiff, we conclude that both prongs are satisfied here.

2.    Was there a constitutional violation?

Plaintiff's deadly-force claim is analyzed under the objective reasonableness standard of the Fourth Amendment. *Plumhoff*, 134 S. Ct. at 2020 (citing *Graham v. Connor*, 490 U.S. 386 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985)). The reasonableness standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the

12

countervailing governmental interests at stake." *Id.* (internal citations omitted).

Reasonableness in this context depends on all the circumstances relevant to an

officer's decision to use force and the amount of force used. *Jean–Baptiste v.*

*Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010). We view the circumstances "from

the perspective 'of a reasonable officer on the scene, rather than with the 20/20

vision of hindsight.'" *Plumhoff*, 134 S. Ct. at 2020 (quoting *Graham*, 490 U.S. at

396–97). And we allow for the fact that officers are often required to make "split-

second judgments—in circumstances that are tense, uncertain, and rapidly

evolving—about the amount of force that is necessary in a particular situation." *Id.*

(internal quotation marks omitted).

When considering whether a use of deadly force was reasonable, relevant

circumstances include "the seriousness of the crime, whether the suspect poses an

immediate danger to the officer or others, whether the suspect resisted or attempted

to evade arrest, and the feasibility of providing a warning before employing deadly

force." *Jean-Baptiste*, 627 F.3d at 821. We also have observed that an officer may

constitutionally use deadly force when he:

> (1) "has probable cause to believe that the suspect poses a threat of
> serious physical harm, either to the officer or to others" or "that he has
> committed a crime involving the infliction or threatened infliction of
> serious physical harm"; (2) reasonably believes that the use of deadly
> force was necessary to prevent escape; and (3) has given some
> warning about the possible use of deadly force, if feasible.

13

*McCullough*, 559 F.3d at 1206 (quoting *Vaughan v. Cox*, 343 F.3d 1323, 1329–30 (11th Cir. 2003)).

Construing the facts in Plaintiff's favor, Adams had neither tried to choke nor otherwise assaulted Defendant. Defendant had no reason to believe that Adams was armed or had attempted to obtain a weapon. Nevertheless, for reasons not made clear, he shot Adams to death as the latter was standing near the rear of his truck. The question then is whether it was reasonable for Defendant to use deadly force against Adams under these circumstances. The answer, obviously, is that it was not reasonable. While an officer may use deadly force in self-defense if an individual poses an immediate threat of serious physical harm, "[a] police officer may not seize an unarmed, nondangerous [person] by shooting him dead." *Garner*, 471 U.S. at 11. Thus, under the facts as construed above, Defendant violated Adams' Fourth Amendment rights through his unreasonable use of deadly force.

3.    Did the law clearly establish that shooting Adams under the above circumstances was in violation of his Fourth Amendment rights?

Even assuming a constitutional violation, Defendant is entitled to qualified immunity unless Plaintiff can show that Adams' Fourth Amendment rights were "clearly established" at the time of the shooting. *Plumhoff*, 134 S. Ct. at 2023. To be clearly established, the contours of a right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was

14

violating it." *Id.* "The salient question is whether the state of the law at the time of an incident provided 'fair warning' to the defendant[] that [his] alleged conduct was unconstitutional." *Tolan*, 134 S. Ct. at 1866 (internal quotation marks omitted).

Fair warning is most commonly provided by materially similar precedent from the Supreme Court, this Court, or the highest state court in which the case arose. *See Terrell v. Smith*, 668 F.3d 1244, 1256 (11th Cir. 2012). However, a "judicial precedent with materially identical facts is not essential for the law to be clearly established." *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010). Authoritative judicial decisions may "establish broad principles of law" that are clearly applicable to the conduct at issue, and it may also be obvious from "explicit statutory or constitutional statements" that certain conduct is unconstitutional. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1208–09 (11th Cir. 2007); *see also Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) ("We do not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." (internal quotation marks omitted)).

At the time Defendant shot Adams, the law was clearly established that the use of deadly force against an unarmed, non-threatening, and non-fleeing individual is unconstitutional. *See*, *e.g.*, *Garner*, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm

resulting from failing to apprehend him does not justify the use of deadly force to do so."); *Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005) (intentionally shooting a non-threatening individual in the head at close range with a non-lethal round was clearly-established excessive force); *Lundgren v. McDaniel*, 814 F.2d 600, 603 (11th Cir. 1987) ("[S]hooting a suspected felon who was apparently neither fleeing nor threatening the officers or others was—even in July, 1983—an unreasonable seizure and clearly violated [F]ourth [A]mendment law.") (internal footnote omitted); *Pruitt v. City of Montgomery*, 771 F.2d 1475 (11th Cir. 1985) (shooting an unarmed burglary suspect who posed no risk of harm to police or others was unconstitutional).

The law being clearly established, Plaintiff has shown that both prongs of the qualified immunity test are met. Accordingly, we affirm the district court's denial of summary judgment to Defendant on his qualified immunity defense.

**AFFIRMED.**