[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-15094

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 20, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 01-00148-CV-WBH-3

VICTOR HARRIS,

Plaintiff-Appellee,

versus

COWETA COUNTY, GEORGIA, et al.,

Defendants,

MARK FENNINGER,
Sgt.,
TIMOTHY C. SCOTT,
Deputy,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 20, 2005)

Before BIRCH, BARKETT and COX, Circuit Judges.

BARKETT, Circuit Judge:

Coweta County Deputy Timothy Scott ("Scott") and Coweta County Sergeant Mark Fenninger ("Fenninger") appeal from the denial of summary judgment on their claims of qualified immunity on Victor Harris' ("Harris") 42 U.S.C. § 1983 action based on Harris' allegations that Scott violated his Fourth Amendment rights by using excessive force during a high-speed car chase, and that Fenninger violated his Fourth Amendment rights by authorizing that use of force.

## I. BACKGROUND

Viewed in the light most favorable to the non-movant, Harris, the facts pertaining to the chase that covered approximately nine miles and lasted approximately six minutes are as follows. Between 10:30 and 11:00 pm on March 29, 2001, a Coweta County deputy clocked Harris' vehicle at 73 miles per hour in a 55 mile-per-hour zone. The vehicle that Harris was driving was registered in Harris' name and at his proper address. Although the deputy flashed his blue lights, Harris continued driving. The deputy pursued, and in attempting to flee, Harris drove in excess of the speed limit, at speeds between 70 and 90 miles per hour, passed vehicles on double yellow traffic control lanes, and ran through two red lights. Harris stayed in control of his vehicle, utilizing his blinkers while passing or making turning movements.

2

After Harris refused to stop, the deputy radioed dispatch and reported that he was pursuing a fleeing vehicle, and broadcast its license plate number. He did not relay that the underlying charge was speeding. Scott heard the radio communication and joined the pursuit, as it proceeded toward the county line into Fayette County, Georgia.

After crossing into Peachtree City in Fayette County, Harris slowed down, activated his blinker, and turned into a drugstore parking lot located in a shopping complex, where two Peachtree City police vehicles were already stationed. Scott proceeded around the opposite side of the complex in an attempt to prevent Harris from leaving the parking lot and getting onto Highway 74, driving his vehicle directly into Harris' path. Harris attempted to turn to the left to avoid hitting Scott's car, but the two vehicles came in contact with each other, causing minor damage to Scott's cruiser.[1] Harris then entered Highway 74 and continued to flee southward at a high speed.

Through Peachtree City, Scott took over as the lead vehicle in the chase. After getting on Highway 74, Scott radioed a general request for "Permission to PIT him." A "PIT" ("Precision Intervention Technique") maneuver is a driving technique designed to stop a fleeing motorist safely and quickly by hitting the

---

[1]Scott disputes this version of events. For purposes of summary judgment, we accept Harris' version.

3

fleeing car at a <u>specific</u> point on the vehicle, which throws the car into a spin and brings it to a stop.[2] Harris' expert's report attests that "national law enforcement standards require than [sic] an officer be trained in all deadly force applications before being permitted to use those applications." R. 24, at 9-10. Scott had not been trained in executing this maneuver. He and the other Coweta officers did not undergo a training on PITs until <u>after</u> the incident.

Fenninger was the supervisor who responded to Scott's radio call and granted Scott permission to employ the PIT, telling him to: "Go ahead and take him out. Take him out." Fenninger – who tuned into the transmissions about the pursuit late – did not know how the pursuit originated, the speeds of the vehicles, the numbers of motorists or pedestrians on the roadways, or how dangerously Harris was driving. Fenninger also did not request further details about the pursuit prior to authorizing the PIT.

After receiving approval, Scott determined that he could not perform the PIT maneuver because he was going too fast. Instead, however, he rammed his cruiser directly into Harris' vehicle, causing Harris to lose control, leave the roadway, run down an embankment, and crash. As a result, Harris was rendered a quadriplegic.

---

[2]At the time of the chase, the Coweta County Sheriff's Department had a vehicle pursuit policy, which stated that "[d]eliberate physical contact between vehicles at anytime may be justified to terminate the pursuit upon the approval of the supervisor." R. 48, Ex. 11, at 93.

## II. STANDARD OF REVIEW

We review the denial of summary judgment <u>de novo</u>. <u>Cagle v. Sutherland</u>, 334 F.3d 980, 985 (11th Cir. 2003). In conducting our review, we apply the same legal standards as the district court. <u>Vaughan v. Cox</u>, 343 F.3d 1323, 1328 (11th Cir. 2003). Thus, we view the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in his favor. <u>Id.</u> Summary judgment is not appropriate unless the evidence demonstrates that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.P. 56(c).

A defendant's entitlement to qualified immunity is a question of law, also to be reviewed <u>de novo</u>. <u>Cagle</u>, 334 F.3d at 985.

## III. DISCUSSION[3]

As we have often stated, "[q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (internal citations and quotation marks omitted). This immunity

---

[3]We reject Harris' first argument that we are without jurisdiction over this interlocutory appeal. This appeal goes beyond the evidentiary sufficiency of the district court's decision.

5

"allow[s] government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation[.]" Id. (citing Anderson v. Creighton, 483 U.S. 635, 638 (1987)). Thus, in order to receive its protections, the government official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004) (citing Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)). In this case, there is no dispute that when Scott rammed Harris' vehicle during the high-speed pursuit on March 29, 2001, he did so as part of his discretionary functions as deputy of the Coweta County Sheriff's Department (CCSD). It is likewise clear (and uncontested) that Fenninger's authorization of Scott's use of a PIT maneuver was a decision made in his capacity as supervisor to Scott and sergeant of the CCSD.

The defendants having established their eligibility for qualified immunity, the burden then shifts to the plaintiff to show that qualified immunity is not appropriate. Lee, 284 F.3d at 1194. This next step consists of a two-part inquiry, set forth in Saucier v. Katz, 533 U.S. 194, 201 (2001). First we ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. If, assuming the plaintiff's allegations were true, no such right would have been violated, the analysis is

6

complete. However, if a constitutional violation can be made out on the plaintiff's facts, we then must determine "whether, at the time of the incident, every objectively reasonable police officer would have realized the acts violated already clearly established federal law." Garrett v. Athens-Clarke County, 378 F.3d 1274, 1278-79 (11th Cir. 2004) (citing Saucier, 533 U.S. at 201-02). We address these questions in turn.

**A.      *Did Scott and Fenninger Violate Harris' Constitutional Right To Be Free From An Unreasonable Seizure?***

Harris alleges that Scott violated his Fourth Amendment right to be "free from the use of excessive force in the course of an investigatory stop or other 'seizure' of the person." Kesinger, 381 F.3d at 1248 (citing Graham v. Connor, 490 U.S. 386 (1989)). To establish an excessive force claim, Harris must show first that he was subjected to a "seizure" within the meaning of the Fourth Amendment. Vaughan, 343 F.3d at 1328.

The district court concluded, and Scott does not contest, that Harris was seized by Scott when the latter rammed his vehicle, causing him to lose control and crash. Pursuant to Brower v. County of Inyo, 489 U.S. 593, 596-99 (1989), using a vehicle to stop and apprehend a suspect is a seizure. In Brower, the Supreme Court held that a fleeing suspect who fatally crashed into a so-called "deadman"

7

roadblock[4] during a high-speed chase had been "seized" by the police who set up

the roadblock.[5] The Court defined a seizure as "a governmental termination of

freedom of movement through means intentionally applied." Brower, 489 U.S. at

597 (emphasis omitted). The Court reasoned that "it [is] enough for a seizure that

a person be stopped by the very instrumentality set in motion or put in place in

order to achieve that result . . . Brower was meant to be stopped by the physical

obstacle of the roadblock – and . . . was so stopped." Id. at 599. The Court noted

that if "the police cruiser had pulled alongside the fleeing car and sideswiped it,

producing the crash, then the termination of the suspect's freedom of movement

would have been a seizure." Id., 489 U.S. at 597. See also Hernandez v. Jarman,

340 F.3d 617, 623 (8th Cir. 2003) ("As we have held, a Fourth Amendment seizure

occurs as a result of a car collision only where the police officer intended the

collision to be the result."); Donovan v. City of Milwaukee, 17 F.3d 944, 949 (7th

Cir. 1994) (finding a Fourth Amendment "seizure" where officer intentionally

---

[4]A deadman or "blind" roadblock is an obstacle (usually a police car or truck) placed on the road in a manner that prevents an oncoming driver who is being pursued by the police from knowing the road is blocked.

[5]This court held in Adams v. St. Lucie County Sheriff's Dept., 998 F.2d 923, 923 (11th Cir. 1993) (en banc) that *as of 1985* (before Brower), it was not "clearly established" that striking a car during a police chase constituted a seizure. That case was also decided before Saucier and did not decide the first question which must be answered in a qualified immunity case pursuant to Saucier: whether a constitutional right had been violated. See Adams, 962 F.2d at 1577-78 ("To resolve the question of qualified immunity, we need not decide today whether the Fourth Amendment was violated.")

8

backed up squad car into the path of a fleeing motorcycle and provoked collision, sending both driver and passenger airborne).

Having determined that Harris was seized, we turn to the question of whether the force used by Scott to effectuate the seizure was reasonable, in light of the facts according to Harris.[6] In <u>Tennessee v. Garner</u>, 471 U.S. 1, 8 (1985), the Supreme Court made clear that the reasonableness of a seizure "depends on not only when a seizure is made, but also how it is carried out." In <u>Garner</u>, as in this case, the Court considered a suit for damages under 42 U.S.C. § 1983 on the grounds that the manner of the seizure violated Garner's constitutional rights. The police argued that because Garner was a fleeing felon, <u>any</u> force necessary to capture him was permissible. The Supreme Court held that the use of deadly force may not be used to seize a fleeing felon "unless it is necessary to prevent the escape **and** the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." <u>Id.</u> at 3 (emphasis supplied). The Court concluded that:

> [t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not

---

[6]In applying the test, we must take "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Graham v. Connor</u>, 490 U.S. 386, 396-97 (1989). The reasonableness inquiry is an objective one: "the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." <u>Id.</u> at 397.

better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.

Id. at 11.

The Court recognized that limited circumstances might justify the use of deadly force, to wit: (1) "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," or "if the suspect threatens the officer with a weapon or there is probable cause to believe that he had committed a crime involving the infliction or threatened infliction of serious physical harm," **and** (2) if deadly force is "necessary to prevent escape," **and**, (3) "if, where feasible, some warning has been given." Id. 471 U.S. at 11-12. See also Vaughan, 343 F.3d at 1329-30. Without meeting all of these conditions, the use of deadly force is constitutionally unreasonable.

"Deadly force" is force that creates "a substantial risk of causing death or serious bodily injury." Pruitt v. City of Montgomery, 771 F.2d 1475, 1479 n.10 (11th Cir. 1985) (citing Model Penal Code (MPC) § 3.11(2) (1962)).[7] The Coweta

---

[7]In Pruitt we also looked to the Alabama Code, which defined "deadly force" as "[f]orce which, under the circumstances in which it is used, is readily capable of causing death or serious physical injury." 771 F.2d at 1479 n. 10.

10

County Sheriff Department's Use of Force Policy provides an analogous definition – "[f]orce which, under the circumstances in which it is used, is readily capable of causing death or other serious injury." R. 48 at Ex. 12, at 82. In Pruitt, we found that shooting a suspect in the legs to stop him was a "use of deadly force" in the constitutional sense, even though the officer did not necessarily shoot to kill. We reasoned that the MPC and Alabama Code definitions of deadly force "clearly encompass[ed]" the force used in that case because "[the officer], at the least, purposely fired his shots at Pruitt's legs, and in doing so used force capable of causing serious physical injury." 771 F.2d at 1479 n.10.

Like other instrumentalities, the use of an automobile cannot be construed in every circumstance as deadly force. However, an automobile, like a gun, can be used deliberately to cause death or serious bodily injury. See Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002) (suspect "used the automobile in a manner to give reasonable policemen probable cause to believe that it had become a deadly weapon with which [suspect] was armed"); U.S. v. Gualdado, 794 F.2d 1533, 1535 (11th Cir. 1986) ("Almost any object which as used or attempted to be used may endanger life or inflict great bodily harm, or which is likely to produce death or great bodily injury, can in some circumstances be a 'dangerous weapon.' . . . An automobile has been held to constitute a deadly weapon when used to run down

11

a law enforcement officer. Likewise, in this instance appellants' boat, used in an attempt to ram the vessel of Customs officials, also could properly be considered a deadly weapon.") (internal citations omitted). See also Hernandez, 340 F.3d at 624 (officer had probable cause to shoot suspect where suspect "posed an imminent threat of serious physical harm to himself and to others as evidenced by [suspect's] driving head-on into [the officer's] vehicle"); Ludwig v. Anderson, 54 F.3d 465, 473 (8th Cir. 1995) (an attempt to hit an individual (not in a vehicle) with a moving squad car "is an attempt to apprehend by use of deadly force"); Donovan, 17 F.3d at 949-50 (backing up of a squad car into path of a fleeing motorcycle was an application of deadly force); Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992) (citing United States v. Sanchez, 914 F.2d 1355 (9th Cir. 1990)) ("even unarmed, [the plaintiff] was not harmless; a car can be a deadly weapon."). Cf. Brower v. County of Inyo, 884 F.2d 1316, 1317-18 (9th Cir. 1989) (assuming without deciding that deadman roadblock to stop a fleeing vehicle during a high-speed chase was an application of "deadly force" and applying Garner analysis).

Under an objective view of the facts of this case, there is little dispute that the ramming of Harris' car could constitute a use of "deadly force" and that a jury could so reasonably conclude.[8] See Anderson v. Liberty Lobby, Inc., 477 U.S.

---

[8]See also Scott's Depo., R. 48 at 157-58, (testifying that ramming Harris' vehicle at high speeds constituted a use of deadly force under the CCSD Deadly Force Policy); Fenninger's

12

242, 252 (1986) ("The judge's inquiry [at the summary judgment stage], therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict."). Moreover, none of the limited circumstances identified in Garner that might render this use of deadly force constitutional are present here. Scott did not have probable cause to believe that Harris had committed a crime involving the infliction or threatened infliction of serious physical harm, nor did Harris, prior to the chase, pose an imminent threat of serious physical harm to Scott or others.

None of the antecedent conditions for the use of deadly force existed in this case. Harris' infraction was speeding (73 mph in a 55 mph zone). There were no warrants out for his arrest for anything, much less for the requisite "crime involving the infliction or threatened infliction of serious physical harm." Garner, 471 U.S. at 11-12. Indeed, neither Scott nor Fenninger had any idea why Harris was being pursued. The use of deadly force is not "reasonable" in a high-speed chase based only on speeding and evading arrest. Vaughan, 343 F.3d at 1330. The Garner Court specifically recognized that it would be an anomaly to transform

_____

Depo., R. 50 at 62-63 (testifying that he gave authorization to make contact with the understanding that he was authorizing the use of deadly force). See also testimony of other Coweta County and Peachtree City officers stating that they considered that ramming a vehicle at 90 mph could constitute a use of "deadly force." Reynold's Depo., R.49 at 118-119; Yeager Depo., R. 54 at 59; Kinsey Depo., R. 51 at 44; Ercole Depo., R. 47 at 37-40.

"every fleeing misdemeanant into a fleeing felon . . . solely by virtue of his flight."

471 U.S. at 10 n.9.[9]  A high-speed chase of a suspect fleeing after a traffic

infraction does not amount to the "substantial threat" of imminent physical harm

that Garner requires before deadly force can be used.  Garner made clear that "[i]t

is not better that all . . . suspects die than that they escape." 471 U.S. at 11.[10]

We reject the defendants' argument that Harris' driving must, as a matter of

law, be considered sufficiently reckless to give Scott probable cause to believe that

he posed a substantial threat of imminent physical harm to motorists and

pedestrians.  This is a disputed issue to be resolved by a jury.  As noted by the

district court judge, taking the facts from the non-movant's viewpoint, Harris

remained in control of his vehicle, slowed for turns and intersections, and typically

---

[9]As recognized in Vaughan:

> Under Garner, a police officer can use deadly force to prevent the escape of a fleeing non-violent felony suspect only when the suspect poses an immediate threat of serious harm to police officers or others.  In this case, the danger presented by [the suspects'] continued flight was the risk of an accident during the pursuit.  Applying Garner in a common-sense way, a reasonable officer would have known that [ramming a car when both automobiles were] traveling at approximately 80 miles per hour . . . would transform the risk of an accident on the highway into a virtual certainty."

343 F.3d at 1332-33.

[10]We recognize that whether or not Harris would have escaped has no bearing on the excessive force analysis, as Garner specifically based its holding on the assumption that a fleeing suspect would escape. 471 U.S. at 11. We note, however, as did the district court, that there were other means to track Harris down as the pursuing officers had a description of the vehicle as well as the license plate number.  We also note that absolutely no warning was given that Scott intended to use deadly force.

14

used his indicators for turns.  He did not run any motorists of the road.  Cf. Pace,
283 F.3d at 1282 (officer had probable cause to believe that car had become a
deadly weapon with which defendant was armed where suspect drove through
residential neighborhood at 50 to 60 mph, swerved at oncoming police cars, nearly
hit elderly motorist head-on when driving on wrong side of road, and accelerated
towards police car roadblock forcing officer off of the road to avoid collision);
Cole v. Bone, 993 F.2d 1328, 1331-1334 (8th Cir. 1993) (deadly force was
reasonable to stop high-speed chase where truck forced more than one hundred
cars off the road or out of the truck's way and endangered the lives of many other
motorists during the pursuit, chase lasted 50 miles, and officers attempted to slow
the vehicle using several types of roadblocks).  Nor was he a threat to pedestrians
in the shopping center parking lot, which was free from pedestrian and vehicular
traffic as the center was closed.  Significantly, by the time the parties were back on
the highway and Scott rammed Harris, the motorway had been cleared of motorists
and pedestrians allegedly because of police blockades of the nearby intersections.[11]

_____

[11]Nor does the evidence show that Scott or the other officers were in immediate danger or
threatened with imminent harm.  Accepting Harris' version of events, Harris did not attempt to
ram, run over, side-swipe, or swerve into any of the officers (which might have put their lives in
danger in the parking lot), nor did he attempt any such conduct once he was back on the highway
immediately before the seizure. Cf. Hernandez, 340 F.3d at 623 (evidence of plaintiff's attempts
to intentionally drive his car directly into officer's vehicle supported finding that officer's use of
deadly force was reasonable); Smith v. Freland, 954 F.2d. 343, 347 (6th Cir. 1992) (use of deadly
force not unreasonable where suspect "posed a major threat" to officers manning roadblock by
driving directly into them on a residential dead-end street and "had proven he would do almost

15

We conclude that ramming Harris' vehicle under the facts alleged here, if believed by a jury, would violate Harris' constitutional right to be free from excessive force during a seizure. Accordingly, a reasonable jury could find that Scott violated Harris' Fourth Amendment rights.

With respect to Fenninger, however, we cannot come to the same conclusion. Although the use of deadly force cannot be authorized under Garner without knowing that the Garner conditions have been met, the facts of this case do not establish that Fenninger authorized deadly force. Rather, the evidence shows that Fenninger authorized a PIT – defined by the district court as "a driving technique designed to stop a fleeing motorist safely and quickly by hitting the fleeing car at a specific point on the vehicle, which throws the car into a spin and brings it to a stop." This definition assumes that the maneuver will be executed at lower speeds by properly trained officers, and therefore can terminate a flight "safely." See e.g., Geoffrey Alpert's Expert Report, R. 24 at 5 (stating that the PIT requires a set of defined circumstances in order for it to be performed safely (i.e., at low speeds on wide straightaways, on dry pavement by a properly trained driver)); National Law Enforcement and Corrections Technology Center Bulletin, U.S. Department of Justice, October 1996, at 4-5 (stating that the PIT "is not applicable

anything to avoid capture").

in every situation, the key to its effective use is to carefully choose a favorable spot before attempting PIT and to first consider the possible effects on other traffic and pedestrians"); National San Diego Police Department Use of Force Task Force Recommendations, Executive Summary at 37 ("Utilized at speeds of 35 mph or less, the PIT maneuver improves officer and public safety by removing the threat of pursuit as quickly and safely as possible."). Scott, however, chose not to execute a PIT at all, but rather to ram the car at a very high speed from behind. Because this ramming was not authorized by Fenninger, we cannot say that Fenninger's conduct – authorization of a safe PIT that was not executed – violated Harris' constitutional rights. Thus, since Fenninger is not liable for a constitutional violation, summary judgment should be granted in his favor. The district court's ruling as to Fenninger is therefore reversed.

### B. Is Scott entitled to qualified immunity?

Having determined that a jury could have reasonably found the violation of a constitutional right by Scott, we now ask whether the law as it existed on March 29, 2001, was sufficiently clear to give reasonable law enforcement officers "fair notice" that ramming a vehicle under these circumstances was unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002); Anderson v. Creighton, 483 U.S. 635, 640 (1987).

17

Scott is not entitled to summary judgment if a "general constitutional rule already identified in the decisional law . . . appl[ied] with obvious clarity to [his conduct]." United States v. Lanier, 520 U.S. 259, 271 (1997). It is well-established that "general statements of the law" are perfectly capable of giving clear and fair warning to officers even where "the very action in question has [not] previously been held unlawful." Id. (quoting Anderson, 483 U.S. at 640); Vinyard, 311 F.3d at 1350-51. Thus, where a general constitutional rule applies with "obvious clarity" to a particular case, factually similar decisional law is not required to defeat a claim of qualified immunity. Lanier, 520 U.S. at 271. We find that Garner enunciates such a rule. 471 U.S. at 11-12.

The Garner rule applies with "obvious clarity" whenever a police officer contemplates the use of deadly force against an unarmed and nondangerous fleeing suspect. See Vaughan, 343 F.3d at 1323; Brosseau v. Haugen, 125 S.Ct. 596, 599 (2004) ("Of course, in an obvious case, the[] standards [enunciated in Graham v. Connor, 490 U.S. 386 (1989), and Garner] can 'clearly establish' the answer, even without a body of relevant case law") (citing Hope, 536 U.S. at 738). This is so because the general deadly force principle announced in Garner is "not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." Vinyard, 311 F.3d at 1351. Here, under the facts

18

averred by Harris, and as interpreted from the perspective of an objectively reasonable officer, it was clear that none of the three Garner requirements for the use of deadly force were present when Scott rammed Harris.

The absence of any Garner preconditions to the use of deadly force makes this an "obvious" case under Garner and distinguishes its from Brosseau v. Haugen. In Brosseau, the Supreme Court reversed the denial of qualified immunity to an officer sued for Fourth Amendment violations under § 1983 for shooting a suspected felon as he attempted to flee in a vehicle, where the officer had arguable probable cause to believe that the suspect posed an imminent threat of serious physical harm to several officers and citizens in the immediate surrounding area.[12] Unlike Harris, Haugen was a suspected felon with a no-bail warrant out for his arrest, with whom Brosseau had a violent physical encounter prior to the shooting. Believing that Haugen had entered the Jeep to retrieve a gun, Brosseau

_____

[12]These facts are not comparable to those in Harris. In the light most favorable to Harris, there is no comparable evidence that Scott had arguable probable cause to believe that Harris posed an immediate risk of death or serious danger to Scott, other officers, or nearby citizens. Harris was being chased for a traffic violation, not a "crime involving the infliction or threatened infliction of serious physical harm." Garner, 471 U.S. at 11. Unlike the situation in Brosseau, the parties were not in close physical proximity nor had they had a one-on-one struggle. In fact, Scott and the other pursuing officers were following Harris from behind in their squad cars. At the time of the ramming, apart from speeding and running two red lights, Harris was driving in a non-aggressive fashion (i.e., without trying to ram or run into the officers). Moreover, unlike Haugen, who was surrounded by officers on foot, with other cars in very close proximity in a residential neighborhood, Scott's path on the open highway was largely clear. The videos introduced into evidence show little to no vehicular (or pedestrian) traffic, allegedly because of the late hour and the police blockade of the nearby intersections. Finally, Scott issued absolutely no warning (e.g., over the loudspeaker or otherwise) prior to using deadly force.

broke the windowpane of the Jeep, and attempted to stop Haugen by hitting him over the head with the butt and barrel of her gun. Haugen was undeterred, however, and began to take off out of the driveway, without regard for safety of those in his immediate vicinity – the three officers on foot (Haugen at his immediate left and two others with a K-9 somewhere nearby), a woman and her 3-year-old child in a small vehicle parked directly in front of the Jeep and 4 feet away, and two men in a parked vehicle 20 to 30 feet away. In addition, prior to shooting, Brosseau warned Haugen that she would shoot by pointing her gun at the suspect while commanding him to get out of the car, and then using the gun to shatter the glass of the car window and hit Haugen in an attempt to get the keys.

Looking to Garner, the Brosseau Court recognized that its clearly established deadly force rule (i.e., that "it is unreasonable for an officer to 'seize an unarmed non dangerous suspect by shooting him dead' ") was limited by the Court's further instruction that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." Brosseau, 125 S.Ct. at 598 (quoting Garner, 471 U.S. at 11). Thus, the Brosseau Court held that Garner did not provide a reasonable officer with fair notice of a Fourth Amendment violation in "the situation [Brosseau] confronted: whether to shoot a

disturbed felon, set on avoiding capture through vehicular flight, <u>when persons in the immediate area are at risk from that flight</u>." <u>Id.</u> at 600 (emphasis added).

The Court did acknowledge, however, that the standard in <u>Garner</u> can "clearly establish" whether or not the use of deadly force is unconstitutional in the "obvious case." <u>Id.</u> at 599. The facts in <u>Harris</u> present just such an "obvious" case, since the evidence shows that Scott lacked the sufficient probable cause to warrant the use of deadly force. In this way, <u>Harris</u> is more like <u>Vaughan</u>, 343 F.3d at (2003), than <u>Brosseau</u> or the cases cited therein.[13] <u>See Vaughan</u>, 343 F.3d at 1333 ("appl[ying] <u>Garner</u> in a common-sense way" to hold that a reasonable officer would have known that it was unconstitutional to use deadly force during a high-speed pursuit <u>where the suspect posed no immediate threat of harm to police officers or others</u>).[14] Without the existence of an immediate threat of harm to the officers or others that could justify the officer's probable cause, the <u>Garner</u> rule prohibiting deadly force clearly applies.

Scott argues that <u>Garner</u> does not apply because in that case, the officer

---

[13]In the cases relied upon by <u>Brosseau</u>, the officer had arguable probable cause to believe that the suspects presented an <u>immediate</u> risk of danger to the officers or others. <u>See Brosseau</u>, 125 S.Ct. at 600 (citing <u>Cole v. Bone</u>, 993 F.2d 1328 (8th Cir. 1993), and <u>Smith v. Freland</u>, 954 F.2d 343 (6th Cir. 1992)).

[14]The original panel opinion in <u>Vaughan</u>, which granted summary judgment to the defendant officer on grounds of qualified immunity, was vacated by the Supreme Court and remanded for reconsideration in light of the Court's intervening decision in <u>Hope</u>. <u>See Vaughan</u>, 536 U.S. 953 (2002).

applied the deadly force with a gun.  Scott relies on our holding in Adams that in 1985, the caselaw was insufficiently developed to give notice to every objectively reasonable officer that a police car ramming another car during a high-speed pursuit would constitute an unreasonable seizure.  However, the facts in Adams occurred before Brower was decided, and thus, at a time before the Supreme Court made clear that the intentional use of a vehicle to apprehend a suspect was a Fourth Amendment seizure.  That principle is now settled.  Garner made clear that the use of deadly force against an unarmed and nondangerous fleeing felony suspect was unlawful and set out the specific criteria necessary before the application of deadly force is warranted.  This law clearly applied to the use of a vehicle to seize a suspect at the time of the incident in this case.

We are satisfied that, under Hope, the requirement that the officers have "fair warning" that their conduct violates a constitutional right through a general constitutional rule, "even through the very action in question has [not] previously been held unlawful," has been satisfied.  536 U.S. at 740-41 (internal quotation marks and citations omitted).  A reasonable police officer would have known in 2001 that a vehicle could be used to apply deadly force,[15] could be used to effectuate a seizure,[16] and that deadly force could not be used to apprehend a

---

[15]See citations on pages 11-12, supra.

[16]Brower, 489 U.S. at 596-99.

22

fleeing suspect unless the conditions set out in Garner existed. Garner, 471 U.S. at 11-12. See also Vaughan, 343 F.3d at 1329-30. The Garner Court used the term "deadly force," not "handgun," in enunciating its rule. Garner, 471 U.S. at 11-12 ("Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used . . .") (emphasis supplied). Moreover, the opinion recognizes the obvious principle that "deadly force" can be inflicted through other means. Id., 471 U.S. at 14 (observing that in times when weapons were rudimentary, "[d]eadly force could be inflicted almost solely in a hand-to-hand struggle . . ."). See Vaughan, 343 F.3d at 1332 ("the Supreme Court in Hope cautioned that we should not be unduly rigid in requiring factual similarity between prior cases and the case under consideration"). See also Gutierrez v. City of San Antonio, 139 F.3d 441, 446 (5th Cir. 1998) (applying Garner "deadly force" rule to determine whether officers were qualifiedly immune for hog-tying suspect).

By 2001, it was well-established in this circuit that "deadly force" means force that creates a substantial risk of causing death or serious bodily injury. Pruitt, 771 F.2d at 1479 n.10. The CCSD policy in 2001 employed a near-identical definition. Moreover, by 1986, we had recognized the potentially lethal nature of

23

an automobile.  See Gualdado, 794 F.2d at 1535, and other cases cited on pages 11-12, supra.

We are satisfied that common sense would inform any reasonable officer that there would be substantial risks of death or bodily harm if he used his vehicle to ram another vehicle at high speeds in the manner employed in this case.  See CCSD Use of Force Policy, R. 48, Ex. 12 at 82 (restricting the use of deadly force to "[w]hen the Deputy reasonably believes it is necessary to defend their [sic] own life or the life of another or to prevent grave bodily injury to themselves [sic] or another, and all other available means of defense have failed or would be inadequate or dangerous," or "[w]hen necessary to prevent the commission of . . . any felony which involves the use or threat of physical force or violence against any person.").  See also Ga. Code Ann., § 17-4-20 (b) ("Sheriffs and peace officers . . . may use deadly force to apprehend a suspected felon only when the officer reasonably believes that the suspect possesses a deadly weapon or any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury; when the officer reasonably believes that the suspect poses an immediate threat of physical violence to the officer or others; or when there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm.");

24

Garner, 471 U.S. at 10-11 ("The fact is that a majority of police departments in this country have forbidden the use of deadly force against nonviolent suspects."). Cf. CCSD Pursuit Policy, R. 48, Ex. 11, at 94 (categorizing roadway barricades as the use of deadly force and limiting their use "only by order of a supervisor and then only as a last resort when the person pursued has proven by his method of flight a total disregard for the lives and safety of the public").

For the foregoing reasons, we find no reversible error in the denial of qualified immunity to Scott at this stage in this case.

Consistent with the foregoing conclusions, the district court opinion is REVERSED IN PART and AFFIRMED IN PART.

COX, Circuit Judge, specially concurring:

I do not join Judge Barkett's opinion for the court, but concur in the judgment.