Justice Stevens,
dissenting.
Today, the Court asks whether an officer may “take actions that place a fleeing motorist at risk of serious injury or death in order to stop the motorist’s flight from endangering the lives of innocent bystanders.” Ante, at 374. Depending on the circumstances, the answer may be an obvious “yes,” an obvious “no,” or sufficiently doubtful that the question of the reasonableness of the officer’s actions should be decided by a jury, after a review of the degree of danger and the alternatives available to the officer. A high-speed chase in a desert in Nevada is, after all, quite different from one that travels through the heart of Las Vegas.
Relying on a de novo review of a videotape of a portion of a nighttime chase on a lightly traveled road in Georgia where no pedestrians or other “bystanders” were present, buttressed by uninformed speculation about the possible consequences of discontinuing the chase, eight of the jurors on this Court reach a verdict that differs from the views of the judges on both the District Court and the Court of Appeals who are surely more familiar with the hazards of driving on Georgia roads than we are. The Court’s justification for this unprecedented departure from our well-settled standard of *390 review of factual determinations made by a district court and affirmed by a court of appeals is based on its mistaken view that the Court of Appeals’ description of the facts was “blatantly contradicted by the record” and that respondent’s version of the events was “so utterly discredited by the record that no reasonable jury could have believed him.” Ante, at 380.
Rather than supporting the conclusion that what we see on the video “resembles a Hollywood-style car chase of the most frightening sort,” ibid.,[1] the tape actually confirms, rather than contradicts, the lower courts’ appraisal of the factual questions at issue. More importantly, it surely does not provide a principled basis for depriving the respondent of his right to have a jury evaluate the question whether the police officers’ decision to use deadly force to bring the chase to an end was reasonable.
Omitted from the Court’s description of the initial speeding violation is the fact that respondent was on a four-lane portion of Highway 34 when the officer clocked his speed at 73 miles per hour and initiated the chase.[2] More significantly — and contrary to the Court’s assumption that respondent’s vehicle “force[d] cars traveling in both directions *391 to their respective shoulders to avoid being hit,” ante, at 379 — a fact unmentioned in the text of the opinion explains why those cars pulled over prior to being passed by respondent. The sirens and flashing lights on the police cars following respondent gave the same warning that a speeding ambulance or fire engine would have provided.[3] The 13 cars that respondent passed on his side of the road before entering the shopping center, and both of the cars that he passed on the right after leaving the center, no doubt had already pulled to the side of the road or were driving along the shoulder because they heard the police sirens or saw the flashing lights before respondent or the police cruisers approached.[4] A jury could certainly conclude that those motorists were exposed to no greater risk than persons who take the same action in response to a speeding ambulance, and that their reactions were fully consistent with the evidence that respondent, though speeding, retained full control of his vehicle.
The police sirens also minimized any risk that may have arisen from running "multiple red lights,” ibid. In fact, respondent and his pursuers went through only two intersections with stop lights and in both cases all other vehicles in sight were stationary, presumably because they had been warned of the approaching speeders. Incidentally, the videos do show that the lights were red when the police cars passed through them but, because the cameras were farther away when respondent did so and it is difficult to discern the color of the signal at that point, it is not entirely clear that *392 he ran either or both of the red lights. In any event, the risk of harm to the stationary vehicles was minimized by the sirens, and there is no reason to believe that respondent would have disobeyed the signals if he were not being pursued.
My colleagues on the jury saw respondent “swerve around more than a dozen other cars,” and “force cars traveling in both directions to their respective shoulders,” ibid., but they apparently discounted the possibility that those cars were already out of the pursuit’s path as a result of hearing the sirens. Even if that were not so, passing a slower vehicle on a two-lane road always involves some degree of swerving and is not especially dangerous if there are no cars coming from the opposite direction. At no point during the chase did respondent pull into the opposite lane other than to pass a car in front of him; he did the latter no more than five times and, on most of those occasions, used his turn signal. On none of these occasions was there a car traveling in the opposite direction. In fact, at one point, when respondent found himself behind a ear in his own lane and there were cars traveling in the other direction, he slowed and waited for the cars traveling in the other direction to pass before overtaking the car in front of him while using his turn signal to do so. This is hardly the stuff of Hollywood. To the contrary, the video does not reveal any incidents that could even be remotely characterized as “close calls.”
In sum, the factual statements by the Court of Appeals quoted by the Court, ante, at 378-379, were entirely accurate. That court did not describe respondent as a “cautious” driver as my colleagues imply, ante, at 380, but it did correctly conclude that there is no evidence that he ever lost control of his vehicle. That court also correctly pointed out that the incident in the shopping center parking lot did not create any risk to pedestrians or other vehicles because the chase occurred just before 11 p.m. on a weekday night and the center was closed. It is apparent from the record (in- *393 eluding the videotape) that local police had blocked off intersections to keep respondent from entering residential neighborhoods and possibly endangering other motorists. I would add that the videos also show that no pedestrians, parked cars, sidewalks, or residences were visible at any time during the chase. The only “innocent bystanders” who were placed “at great risk of serious injury,” ibid., were the drivers who either pulled off the road in response to the sirens or passed respondent in the opposite direction when he was driving on his side of the road.
I recognize, of course, that even though respondent’s original speeding violation on a four-lane highway was rather ordinary, his refusal to stop and subsequent flight was a serious offense that merited severe punishment. It was not, however, a capital offense, or even an offense that justified the use of deadly force rather than an abandonment of the chase. The Court’s concern about the “imminent threat to the lives of any pedestrians who might have been present,” ante, at 384, while surely valid in an appropriate case, should be discounted in a case involving a nighttime chase in an area where no pedestrians were present.
What would have happened if the police had decided to abandon the chase? We now know that they could have apprehended respondent later because they had his license plate number. Even if that were not true, and even if he would have escaped any punishment at all, the use of deadly force in this ease was no more appropriate than the use of a deadly weapon against a fleeing felon in Tennessee v. Garner, 471 U. S. 1 (1985). In any event, any uncertainty about the result of abandoning the pursuit has not prevented the Court from basing its conclusions on its own factual assumptions.[5] *394 The Court attempts to avoid the conclusion that deadly force was unnecessary by speculating that if the officers had let him go, respondent might have been “just as likely” to continue to drive recklessly as to slow down and wipe his brow. Ante, at 385. That speculation is unconvincing as a matter of common sense and improper as a matter of law. Our duty to view the evidence in the light most favorable to the non-moving party would foreclose such speculation if the Court had not used its observation of the video as an excuse for replacing the rule of law with its ad hoc judgment. There is no evidentiary basis for an assumption that dangers caused by flight from a police pursuit will continue after the pursuit ends. Indeed, rules adopted by countless police departments throughout the country are based on a judgment that differs from the Court’s. See, e. g., App. to Brief for Georgia Association of Chiefs of Police, Inc., as Amicus Curiae A-52 (“During a pursuit, the need to apprehend the suspect should always outweigh the level of danger created by the pursuit. When the immediate danger to the public created by the pursuit is greater than the immediate or potential danger to the public should the suspect remain at large, then the pursuit should be discontinued or terminated. . . . [P]ursuits should usually be discontinued when the violator’s identity has been established to the point that later apprehension can be accomplished without danger to the public”).
Although Gamer may not, as the Court suggests, “establish a magical on/off switch that triggers rigid preconditions” *395 for the use of deadly force, ante, at 382, it did set a threshold under which the use of deadly force would be considered constitutionally unreasonable:
“Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.” 471 U. S., at 11-12.
Whether a person’s actions have risen to a level warranting deadly force is a question of fact best reserved for a jury.[6] Here, the Court has usurped the jury’s factfinding function and, in doing so, implicitly labeled the four other judges to review the case unreasonable. It chastises the Court of Appeals for failing to “vie[w] the facts in the light depicted by the videotape” and implies that no reasonable person could view the videotape and come to the conclusion that deadly force was unjustified. Ante, at 380-381. However, the three judges on the Court of Appeals panel apparently did view the videotapes entered into evidence[7] and described a very different version of events:
“At the time of the ramming, apart from speeding and running two red lights, Harris was driving in a non- *396 aggressive fashion (i. e., without trying to ram or run into the officers). Moreover, . . . Scott’s path on the open highway was largely clear. The videos introduced into evidence show little to no vehicular (or pedestrian) traffic, allegedly because of the late hour and the police blockade of the nearby intersections. Finally, Scott issued absolutely no warning (e. g., over the loudspeaker or otherwise) prior to using deadly force.” 433 F. 3d 807, 819, n. 14 (CA11 2005).
If two groups of judges can disagree so vehemently about the nature of the pursuit and the circumstances surrounding that pursuit, it seems eminently likely that a reasonable juror could disagree with this Court’s characterization of events. Moreover, under the standard set forth in Gamer, it is certainly possible that “a jury could conclude that Scott unreasonably used deadly force to seize Harris by ramming him off the road under the instant circumstances.” 433 F. 3d, at 821.
The Court today sets forth a per se rule that presumes its own version of the facts: “A police officer’s attempt to terminate a dangerous high-speed ear chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death.” Ante, at 386 (emphasis added). Not only does that rule fly in the face of the flexible and case-by-case “reasonableness” approach applied in Garner and Graham v. Connor, 490 U. S. 386 (1989), but it is also arguably inapplicable to the case at hand, given that it is not clear that this chase threatened the life of any “innocent bystande[r].”[8] In my view, the risks inherent in justifying unwarranted police conduct on the basis of unfounded as *397 sumptions are unacceptable, particularly when less drastic measures — in this case, the use of stop sticks[9] or a simple warning issued from a loudspeaker — could have avoided such a tragic result. In my judgment, jurors in Georgia should be allowed to evaluate the reasonableness of the decision to ram respondent’s speeding vehicle in a manner that created an obvious risk of death and has in fact made him a quadriplegic at the age of 19.
I respectfully dissent.

 I can only conclude that my colleagues were unduly frightened by two or three images on the tape that looked like bursts of lightning or explosions, but were in fact merely the headlights of vehicles zooming by in the opposite lane. Had they learned to drive when most high-speed driving took place on two-lane roads rather than on superhighways — when split-second judgments about the risk of passing a slowpoke in the face of oncoming traffic were routine — they might well have reacted to the videotape more dispassionately.

 According to the District Court record, when respondent was clocked at 73 miles per hour, the deputy who recorded his speed was sitting in his patrol car on Highway 34 between Lora Smith Road and Sullivan Road in Coweta County, Georgia. At that point, as well as at the point at which Highway 34 intersects with Highway 154 — where the deputy caught up with respondent and the videotape begins — Highway 34 is a four-lane road, consisting of two lanes in each direction with a wide grass divider separating the flow of traffic.

 While still on the four-lane portion of Highway 34, the deputy who had docked respondent’s speed turned on his blue light and siren in an attempt to get respondent to pull over. It was when the deputy turned on his blue light that the dash-mounted video camera was activated and began to record the pursuit.

 Although perhaps understandable, because their volume on the sound recording is low (possibly due to sound proofing in the officer’s vehicle), the Court appears to minimize the significance of the sirens audible throughout the tape recording of the pursuit.

 In noting that Scott’s action “was certain to eliminate the risk that respondent posed to the public” while “ceasing pursuit was not,” the Court prioritizes total elimination of the risk of harm to the public over the risk that respondent may be seriously injured or even killed. Ante, at 385 (emphasis in original). The Court is only able to make such a statement *394 by assuming, based on its interpretation of events on the videotape, that the risk of harm posed in this case, and the type of harm involved, rose to a level warranting deadly force. These are the same types of questions that, when disputed, are typically resolved by a jury; this is why both the District Court and the Court of Appeals saw fit to have them be so decided. Although the Court claims only to have drawn factual inferences in respondent's favor “to the extent supportable by the record,” ante, at 381, n. 8 (emphasis in original), its own view of the record has clearly precluded it from doing so to the same extent as the two courts through which this case has already traveled, see ante, at 376,378-379.

 In its opinion, the Court of Appeals correctly noted: “We reject the defendants’ argument that Harris’ driving must, as a matter of law, be considered sufficiently reckless to give Scott probable cause to believe that he posed a substantial threat of imminent physical harm to motorists and pedestrians. This is a disputed issue to be resolved by a jury.” Harris v. Coweta Cty., 433 F. 3d 807, 815 (CA11 2005).

 In total, there are four police tapes which captured portions of the pursuit, all recorded from different officers’ vehicles.

 It is unclear whether, in referring to “innocent bystanders,” the Court is referring to the motorists driving unfazed in the opposite direction or to the drivers who pulled over to the side of the road, safely out of respondent’s and petitioner’s path.

 “Stop sticks” are a device which can be placed across the roadway and used to flatten a vehicle’s tires slowly to safely terminate a pursuit.