[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 23, 2005
THOMAS K. KAHN
CLERK

_____

No. 03-15094

_____

D. C. Docket No. 01-00148-CV-WBH-3

VICTOR HARRIS,

Plaintiff-Appellee,

versus

COWETA COUNTY, GEORGIA, et al.,

Defendants,

MARK FENNINGER,  Sgt.,
TIMOTHY C. SCOTT,  Deputy,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(December 23, 2005)

**ON PETITION FOR REHEARING**

Before BIRCH, BARKETT and COX, Circuit Judges.

BARKETT, Circuit Judge:

We sua sponte grant rehearing in this case, vacating our prior opinion, 406 F.3d 1307 (11th Cir. 2005), in its entirety and substituting the following in its place.

Coweta County Deputy Timothy Scott ("Scott") and Coweta County Sergeant Mark Fenninger ("Fenninger") appeal from the denial of summary judgment on their claims of qualified immunity on Victor Harris' ("Harris") 42 U.S.C. § 1983 action based on Harris' allegations that Scott violated his Fourth Amendment rights by using excessive force during a high-speed car chase, and that Fenninger violated his Fourth Amendment rights by authorizing that use of force.

## I. BACKGROUND

Viewed in the light most favorable to the non-movant, Harris, the facts pertaining to the chase that covered approximately nine miles and lasted approximately six minutes are as follows. Between 10:30 and 11:00 pm on March 29, 2001, a Coweta County deputy clocked Harris' vehicle at 73 miles per hour in a 55 mile-per-hour zone. The vehicle that Harris was driving was registered in Harris' name and at his proper address. Although the deputy flashed his blue

2

lights, Harris continued driving. The deputy pursued, and in attempting to flee, Harris drove in excess of the speed limit, at speeds between 70 and 90 miles per hour, passed vehicles on double yellow traffic control lanes, and ran through two red lights. Harris stayed in control of his vehicle, utilizing his blinkers while passing or making turning movements.

After Harris refused to stop, the deputy radioed dispatch and reported that he was pursuing a fleeing vehicle, and broadcast its license plate number. He did not relay that the underlying charge was speeding. Scott heard the radio communication and joined the pursuit, as it proceeded toward the county line into Fayette County, Georgia.

After crossing into Peachtree City in Fayette County, Harris slowed down, activated his blinker, and turned into a drugstore parking lot located in a shopping complex, where two Peachtree City police vehicles were already stationed. Scott proceeded around the opposite side of the complex in an attempt to prevent Harris from leaving the parking lot and getting onto Highway 74, driving his vehicle directly into Harris' path. Harris attempted to turn to the left to avoid hitting Scott's car, but the two vehicles came into contact with each other, causing minor

3

damage to Scott's cruiser.[1]  Harris then entered Highway 74 and continued to flee southward at a high speed.

Through Peachtree City, Scott took over as the lead vehicle in the chase. After getting on Highway 74, Scott radioed a general request for "Permission to PIT him."  A "PIT" ("Precision Intervention Technique") maneuver is a driving technique designed to stop a fleeing motorist safely and quickly by hitting the fleeing car at a <u>specific</u> point on the vehicle, which throws the car into a spin and brings it to a stop.[2]  Harris' expert's report attests that "national law enforcement standards require than [sic] an officer be trained in all deadly force applications before being permitted to use those applications."  R. 24, at 9-10.  Scott had not been trained in executing this maneuver.  He and the other Coweta officers did not undergo a training on PITs until <u>after</u> the incident.

Fenninger was the supervisor who responded to Scott's radio call and granted Scott permission to employ the PIT, telling him to: "Go ahead and take him out.  Take him out."  Fenninger--who tuned into the transmissions about the pursuit late--did not know how the pursuit originated, the speeds of the vehicles,

---

[1] Scott disputes this version of events.  For purposes of summary judgment, we accept Harris' version.

[2] At the time of the chase, the Coweta County Sheriff's Department had a vehicle pursuit policy, which stated that "[d]eliberate physical contact between vehicles at anytime may be justified to terminate the pursuit upon the approval of the supervisor."  R. 48, Ex. 11, at 93.

the numbers of motorists or pedestrians on the roadways, or how dangerously Harris was driving. Fenninger also did not request further details about the pursuit prior to authorizing the PIT.

After receiving approval, Scott determined that he could not perform the PIT maneuver because he was going too fast. Instead, however, he rammed his cruiser directly into Harris' vehicle, causing Harris to lose control, leave the roadway, run down an embankment, and crash. As a result, Harris was rendered a quadriplegic.

## II. STANDARD OF REVIEW

We review the denial of summary judgment de novo. Cagle v. Sutherland, 334 F.3d 980, 985 (11th Cir. 2003). In conducting our review, we apply the same legal standards as the district court. Vaughan v. Cox, 343 F.3d 1323, 1328 (11th Cir. 2003). Thus, we view the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in his favor. Id. Summary judgment is not appropriate unless the evidence demonstrates that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.P. 56©).

A defendant's entitlement to qualified immunity is a question of law, also to

5

be reviewed de novo.  Cagle, 334 F.3d at 985.

### III. DISCUSSION[3]

As we have often stated, "[q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Lee v. Ferraro, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (internal citations and quotation marks omitted).  This immunity "allow[s] government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation[.]" Id. (citing Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).  Thus, in order to receive its protections, the government official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.  Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004) (citing Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)).  In this case, there is no dispute that when Scott rammed Harris' vehicle during the high-speed pursuit on March 29, 2001, he did so as part of his discretionary

---

[3] We reject Harris' first argument that we are without jurisdiction over this interlocutory appeal.  This appeal goes beyond the evidentiary sufficiency of the district court's decision.

functions as deputy of the Coweta County Sheriff's Department (CCSD). It is likewise clear (and uncontested) that Fenninger's authorization of Scott's use of a PIT maneuver was a decision made in his capacity as supervisor to Scott and sergeant of the CCSD.

The defendants having established their eligibility for qualified immunity, the burden then shifts to the plaintiff to show that qualified immunity is not appropriate. Lee, 284 F.3d at 1194. This next step consists of a two-part inquiry, set forth in Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). First we ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. If, assuming the plaintiff's allegations were true, no such right would have been violated, the analysis is complete. However, if a constitutional violation can be made out on the plaintiff's facts, we then must determine "whether, at the time of the incident, every objectively reasonable police officer would have realized the acts violated already clearly established federal law." Garrett v. Athens-Clarke County, 378 F.3d 1274, 1278-79 (11th Cir. 2004) (citing Saucier, 533 U.S. at 201-02, 121 S.Ct. 2151). We address these questions in turn.

*A.* *Did Scott and Fenninger Violate Harris' Constitutional Right To Be Free*

7

*From An Unreasonable Seizure?*

Harris alleges that Scott violated his Fourth Amendment right to be "free from the use of excessive force in the course of an investigatory stop or other 'seizure' of the person." Kesinger, 381 F.3d at 1248 (citing Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). To establish an excessive force claim, Harris must show first that he was subjected to a "seizure" within the meaning of the Fourth Amendment. Vaughan, 343 F.3d at 1328.

The district court concluded, and Scott does not contest, that Harris was seized by Scott when the latter rammed his vehicle, causing him to lose control and crash. Pursuant to Brower v. County of Inyo, 489 U.S. 593, 596-99, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), using a vehicle to stop and apprehend a suspect is a seizure. In Brower, the Supreme Court held that a fleeing suspect who fatally crashed into a so-called "deadman" roadblock[4] during a high-speed chase had been "seized" by the police who set up the roadblock.[5] The Court defined a seizure as

---

[4] A deadman or "blind" roadblock is an obstacle (usually a police car or truck) placed on the road in a manner that prevents an oncoming driver who is being pursued by the police from knowing the road is blocked.

[5] This court held in Adams v. St. Lucie County Sheriff's Dept., 998 F.2d 923, 923 (11th Cir. 1993) (en banc) that as of 1985 it was not "clearly established" that striking a car during a police chase constituted a seizure. That case was decided before Saucier and did not decide the first question which must be answered in a qualified immunity case pursuant to Saucier: whether a constitutional right had been violated. See Adams, 962 F.2d at 1577-78 ("To resolve the question of qualified immunity, we need not decide today whether the Fourth Amendment was violated."). In addition, the question in Adams - whether the striking of a car during a police

8

"a governmental termination of freedom of movement through means intentionally applied." Brower, 489 U.S. at 597, 109 S.Ct. 1378 (emphasis omitted). The Court reasoned that "it [is] enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result ... Brower was meant to be stopped by the physical obstacle of the roadblock--and ... was so stopped." Id. at 599, 109 S.Ct. 1378. The Court noted that if "the police cruiser had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure." Id. at 597, 109 S.Ct. 1378. See also Hernandez v. Jarman, 340 F.3d 617, 623 (8th Cir. 2003) ("As we have held, a Fourth Amendment seizure occurs as a result of a car collision only where the police officer intended the collision to be the result."); Donovan v. City of Milwaukee, 17 F.3d 944, 949 (7th Cir. 1994) (finding a Fourth Amendment "seizure" where officer intentionally backed up squad car into the path of a fleeing motorcycle and provoked collision, sending both driver and passenger airborne).

Having determined that Harris was seized, we turn to the question of

_____

chase constituted a seizure - has been unequivocally answered in the affirmative by the Supreme Court in Brower. See Brower, 109 S.Ct. at 1381. Moreover, the fact that striking the car during the police chase constituted a seizure is not in dispute in this case, as the officer who rammed Harris does not, and could not under the circumstances of this case, contest that he seized Harris.

whether the force used by Scott to effectuate the seizure was reasonable, in light of

the facts according to Harris.[6]  In <u>Tennessee v. Garner</u>, 471 U.S. 1, 8, 105 S.Ct.

1694, 85 L.Ed.2d 1 (1985), the Supreme Court made clear that the reasonableness

of a seizure "depends on not only when a seizure is made, but also how it is

carried out."  In <u>Garner</u>, as in this case, the Court considered a suit for damages

under 42 U.S.C. § 1983 on the grounds that the manner of the seizure violated

Garner's constitutional rights.  The police argued that because Garner was a

fleeing felon, <u>any</u> force necessary to capture him was permissible.  The Supreme

Court held that the use of deadly force may not be used to seize a fleeing felon

"unless it is necessary to prevent the escape <u>and</u> the officer has probable cause to

believe that the suspect poses a significant threat of death or serious physical

injury to the officer or others."  <u>Id</u>. at 3, 105 S.Ct. 1694 (emphasis supplied).  The

Court concluded that:

> [t]he use of deadly force to prevent the escape of all felony suspects,
> whatever the circumstances, is constitutionally unreasonable.  It is not
> better that all felony suspects die than that they escape.  Where the
> suspect poses no immediate threat to the officer and no threat to
> others, the harm resulting from failing to apprehend him does not

---

[6] In applying the test, we must take "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Graham v. Connor</u>, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  The reasonableness inquiry is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." <u>Id</u>. at 397, 109 S.Ct. 1865.

justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.

Id. at 11, 105 S.Ct. 1694.

The Court recognized that limited circumstances might justify the use of deadly force, to wit: (1) "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," or "if the suspect threatens the officer with a weapon or there is probable cause to believe that he had committed a crime involving the infliction or threatened infliction of serious physical harm," and (2) if deadly force is "necessary to prevent escape," and, (3) "if, where feasible, some warning has been given." Id. 471 U.S. at 11-12, 105 S.Ct. 1694. See also Vaughan, 343 F.3d at 1329-30. Without meeting all of these conditions, the use of deadly force is constitutionally unreasonable.

"Deadly force" is force that creates "a substantial risk of causing death or serious bodily injury." Pruitt v. City of Montgomery, 771 F.2d 1475, 1479 n. 10 (11th Cir. 1985) (citing Model Penal Code (MPC) § 3.11(2) (1962)).[7] The Coweta

_____

[7] In Pruitt we also looked to the Alabama Code, which defined "deadly force" as "[f]orce which, under the circumstances in which it is used, is readily capable of causing death or serious physical injury." 771 F.2d at 1479 n. 10.

11

County Sheriff Department's Use of Force Policy provides an analogous definition – "[f]orce which, under the circumstances in which it is used, is readily capable of causing death or other serious injury." R. 48 at Ex. 12, at 82. In Pruitt, we found that shooting a suspect in the legs to stop him was a "use of deadly force" in the constitutional sense, even though the officer did not necessarily shoot to kill. We reasoned that the MPC and Alabama Code definitions of deadly force "clearly encompass[ed]" the force used in that case because "[the officer], at the least, purposely fired his shots at Pruitt's legs, and in doing so used force capable of causing serious physical injury." 771 F.2d at 1479 n. 10.

Like other instrumentalities, the use of an automobile cannot be construed in every circumstance as deadly force. However, an automobile, like a gun, can be used deliberately to cause death or serious bodily injury. See Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002) (suspect "used the automobile in a manner to give reasonable policemen probable cause to believe that it had become a deadly weapon with which [suspect] was armed"); United States v. Gualdado, 794 F.2d 1533, 1535 (11th Cir. 1986) ("Almost any object which as used or attempted to be used may endanger life or inflict great bodily harm, or which is likely to produce death or great bodily injury, can in some circumstances be a 'dangerous weapon.' ... An automobile has been held to constitute a deadly weapon when

12

used to run down a law enforcement officer. Likewise, in this instance appellants' boat, used in an attempt to ram the vessel of Customs officials, also could properly be considered a deadly weapon.") (internal citations omitted). See also Hernandez, 340 F.3d at 624 (officer had probable cause to shoot suspect where suspect "posed an imminent threat of serious physical harm to himself and to others as evidenced by [suspect's] driving head-on into [the officer's] vehicle"); Ludwig v. Anderson, 54 F.3d 465, 473 (8th Cir. 1995) (an attempt to hit an individual (not in a vehicle) with a moving squad car "is an attempt to apprehend by use of deadly force"); Donovan, 17 F.3d at 949-50 (backing up of a squad car into path of a fleeing motorcycle was an application of deadly force); Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992) (citing United States v. Sanchez, 914 F.2d 1355 (9th Cir. 1990)) ("even unarmed, [the plaintiff] was not harmless; a car can be a deadly weapon."). Cf. Brower v. County of Inyo, 884 F.2d 1316, 1317-18 (9th Cir. 1989) (assuming without deciding that deadman roadblock to stop a fleeing vehicle during a high-speed chase was an application of "deadly force" and applying Garner analysis).

Under an objective view of the facts of this case, there is little dispute that the ramming of Harris' car could constitute a use of "deadly force" and that a jury

13

could so reasonably conclude.[8]  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106  S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("The judge's inquiry [at the summary judgment stage], therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.").  Moreover, none of the limited circumstances identified in Garner that might render this use of deadly force constitutional are present here.  Scott did not have probable cause to believe that Harris had committed a crime involving the infliction or threatened infliction of serious physical harm, nor did Harris, prior to the chase, pose an imminent threat of serious physical harm to Scott or others.

None of the antecedent conditions for the use of deadly force existed in this case.  Harris' infraction was speeding (73 mph in a 55 mph zone).  There were no warrants out for his arrest for anything, much less for the requisite "crime involving the infliction or threatened infliction of serious physical harm."  Garner, 471 U.S. at 11-12, 105 S.Ct. 1694.  Indeed, neither Scott nor Fenninger had any idea why Harris was being pursued.  The use of deadly force is not "reasonable" in

---

[8] See also Scott's Depo., R. 48 at 157-58, (testifying that ramming Harris' vehicle at high speeds constituted a use of deadly force under the CCSD Deadly Force Policy);  Fenninger's Depo., R. 50 at 62-63 (testifying that he gave authorization to make contact with the understanding that he was authorizing the use of deadly force).  See also testimony of other Coweta County and Peachtree City officers stating that they considered that ramming a vehicle at 90 mph could constitute a use of "deadly force."  Reynold's Depo., R.49 at 118-119;  Yeager's Depo., R. 54 at 59;  Kinsey's Depo., R. 51 at 44;  Ercole's Depo., R. 47 at 37-40.

a high-speed chase based only on a speeding violation and traffic infractions where there was little, if any, actual threat to pedestrians or other motorists, as the roads were mostly empty and Harris remained in control of his vehicle, and there is no question that there were alternatives for a later arrest. Vaughan, 343 F.3d at 1330. The Garner Court specifically recognized that it would be an anomaly to transform "every fleeing misdemeanant into a fleeing felon ... solely by virtue of his flight." 471 U.S. at 10 n. 9, 105 S.Ct. 1694.[9] A high-speed chase of a suspect fleeing after a traffic infraction does not amount to the "substantial threat" of imminent physical harm that Garner requires before deadly force can be used. Garner made clear that "[i]t is not better that all ... suspects die than that they escape." 471 U.S. at 11, 105 S.Ct. 1694.[10]

---

[9] As recognized in Vaughan:
Under Garner, a police officer can use deadly force to prevent the escape of a fleeing non-violent felony suspect only when the suspect poses an immediate threat of serious harm to police officers or others. In this case, the danger presented by [the suspects'] continued flight was the risk of an accident during the pursuit. Applying Garner in a common-sense way, a reasonable officer would have known that [ramming a car when both automobiles were] traveling at approximately 80 miles per hour ... would transform the risk of an accident on the highway into a virtual certainty.
343 F.3d at 1332-33.

[10] We recognize that whether or not Harris would have escaped has no bearing on the excessive force analysis, as Garner specifically based its holding on the assumption that a fleeing suspect would escape. 471 U.S. at 11, 105 S.Ct. 1694. We note, however, as did the district court, that there were other means to track Harris down as the pursuing officers had a description of the vehicle as well as the license plate number. We also note that absolutely no warning was given that Scott intended to use deadly force.

We reject the defendants' argument that Harris' driving must, as a matter of law, be considered sufficiently reckless to give Scott probable cause to believe that he posed a substantial threat of imminent physical harm to motorists and pedestrians. This is a disputed issue to be resolved by a jury. As noted by the district court judge, taking the facts from the non-movant's viewpoint, Harris remained in control of his vehicle, slowed for turns and intersections, and typically used his indicators for turns. He did not run any motorists of the road. Cf. Pace, 283 F.3d at 1282 (officer had probable cause to believe that car had become a deadly weapon with which defendant was armed where suspect drove through residential neighborhood at 50 to 60 mph, swerved at oncoming police cars, nearly hit elderly motorist head-on when driving on wrong side of road, and accelerated towards police car roadblock forcing officer off of the road to avoid collision); Cole v. Bone, 993 F.2d 1328, 1331-1334 (8th Cir. 1993) (deadly force was reasonable to stop high-speed chase where truck forced more than one hundred cars off the road or out of the truck's way and endangered the lives of many other motorists during the pursuit, chase lasted 50 miles, and officers attempted to slow the vehicle using several types of roadblocks). Nor was he a threat to pedestrians in the shopping center parking lot, which was free from pedestrian and vehicular traffic as the center was closed. Significantly, by the time the parties were back on

16

the highway and Scott rammed Harris, the motorway had been cleared of motorists and pedestrians allegedly because of police blockades of the nearby intersections.[11]

Nor can we countenance the argument that by continuing to flee, a suspect absolves a pursuing police officer of any possible liability for all ensuing actions during the chase. The Supreme Court rejected such an argument in Brower, where it was suggested that the plaintiff in that case "had a number of opportunities to stop his automobile prior to the impact" and thus, could have avoided his own injuries. Brower, 109 S. Ct. at 1380-81 (citation omitted). Justice Scalia noted that essentially the same thing could have been said about the suspect in Garner, that is, the plaintiff's "independent decision to continue the chase can no more eliminate respondents' responsibility for the termination of his movement effected by the roadblock than Garner's independent decision to flee eliminated the Memphis police officer's responsibility for the termination of his movement

---

[11] Nor does the evidence show that Scott or the other officers were in immediate danger or threatened with imminent harm. Accepting Harris' version of events, Harris did not attempt to ram, run over, side-swipe, or swerve into any of the officers (which might have put their lives in danger in the parking lot), nor did he attempt any such conduct once he was back on the highway immediately before the seizure. Cf. Hernandez, 340 F.3d at 623 (evidence of plaintiff's attempts to intentionally drive his car directly into officer's vehicle supported finding that officer's use of deadly force was reasonable); Smith, 954 F.2d at 347 (use of deadly force not unreasonable where suspect "posed a major threat" to officers manning roadblock by driving directly into them on a residential dead-end street and "had proven he would do almost anything to avoid capture").

17

effected by the bullet." Id. at 1381.

We conclude that ramming Harris' vehicle under the facts alleged here, if believed by a jury, would violate Harris' constitutional right to be free from excessive force during a seizure. Accordingly, a reasonable jury could find that Scott violated Harris' Fourth Amendment rights.

With respect to Fenninger, however, we cannot come to the same conclusion. Although the use of deadly force cannot be authorized under Garner without knowing that the Garner conditions have been met, the facts of this case do not establish that Fenninger authorized deadly force. Rather, the evidence shows that Fenninger authorized a PIT--defined by the district court as "a driving technique designed to stop a fleeing motorist safely and quickly by hitting the fleeing car at a specific point on the vehicle, which throws the car into a spin and brings it to a stop." This definition assumes that the maneuver will be executed at lower speeds by properly trained officers, and therefore can terminate a flight "safely." See, e.g., Geoffrey Alpert's Expert Report, R. 24 at 5 (stating that the PIT requires a set of defined circumstances in order for it to be performed safely (i.e., at low speeds on wide straightaways, on dry pavement by a properly trained driver)); National Law Enforcement and Corrections Technology Center Bulletin, U.S. Department of Justice, October 1996, at 4-5 (stating that the PIT "is not

18

applicable in every situation, the key to its effective use is to carefully choose a favorable spot before attempting PIT and to first consider the possible effects on other traffic and pedestrians"); National San Diego Police Department Use of Force Task Force Recommendations, Executive Summary at 37 ("Utilized at speeds of 35 mph or less, the PIT maneuver improves officer and public safety by removing the threat of pursuit as quickly and safely as possible."). Scott, however, chose not to execute a PIT at all, but rather to ram the car at a very high speed from behind. Because this ramming was not authorized by Fenninger, we cannot say that Fenninger's conduct – authorization of a safe PIT that was not executed – violated Harris' constitutional rights. Thus, since Fenninger is not liable for a constitutional violation, summary judgment should be granted in his favor. The district court's ruling as to Fenninger is therefore reversed.

**B.     *Is Scott entitled to qualified immunity?***

Having determined that a jury could have reasonably found the violation of a constitutional right by Scott, we now ask whether the law as it existed on March 29, 2001, was sufficiently clear to give reasonable law enforcement officers "fair notice" that ramming a vehicle under these circumstances was unlawful. Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); Anderson v.

19

Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "The essence of qualified immunity is notice." Holmes v. Kucynda, 321 F.3d 1069, 1077 (11th Cir. 2003) (citing Hope v. Pelzer, 536 U.S. 730 (2002)).

For at least twenty years, since Garner was decided, officers have been on notice that they may not use deadly force to seize a fleeing suspect unless the suspect poses a significant threat of death or serious physical injury. See Garner, 471 U.S. at 11-12; see also Garner, 471 U.S. at 10–11 ("[t]he fact is that a majority of police departments in this country have forbidden the use of deadly force against nonviolent suspects."). Moreover, prior to the incident in question the law was clearly established that an automobile, like a gun, could be used as a deadly instrument. See also Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002) (concluding that fleeing felon in 1998 had used car in a way that made it a "deadly weapon"); United States v. Gualdado, 794 F.2d 1533, 1535 (11th Cir. 1986) ("Almost any object which as used or attempted to be used may endanger life or inflict great bodily harm, or which is likely to produce death or great bodily injury, can in some circumstances be a 'dangerous weapon'" concluding that appellants' boat, used in an attempt to ram the vessel of Customs officials, [could] . . .

properly be considered a deadly weapon.") (internal citations omitted).[12]

It was also clearly established at the time of the instant circumstances that the Fourth Amendment requires a seizure of a fleeing suspect to be reasonable and that deadly force cannot be employed in a situation that requires less-than-lethal force. Garner, 471 U.S. at 8, 11-12 (holding that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable.... A police officer may not seize an unarmed, nondangerous suspect by shooting him dead"; "it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out") (emphasis added); Brower v. County of Inyo, 109 S. Ct. 1378, 1381 (1989). See Terry v. Ohio, 392 U.S. 1, 19-20 (1968) (requiring reasonableness of seizure based on the circumstances, including scope and intensity of seizure); United States v. Ortiz, 422 U.S. 891, 895 (1975) (same); Evans v. Hightower, 117 F.3d 1318, 1320 (11th Cir. 1997) (holding Fourth Amendment violated if seizure occurred and force used to effect the seizure was unreasonable); see generally Mercado v. City of Orlando, 407 F.3d 1152, 1160 (11th Cir. 2005) (holding that in 2002 there

---

[12] See also Hawkins v. City of Farmington, 189 F.3d 695, 703 (8th Cir. 1999); Ludwig, 54 F.3d at 473 (an attempt to hit an individual (not in a vehicle) with a moving squad car "is an attempt to apprehend by use of deadly force"); Donovan, 17 F.3d at 949-50 (backing up of a squad car into path of a fleeing motorcycle was an application of deadly force); Sturges v. Matthews, 53 F.3d 659, 661 n.1 (4th Cir. 1995); Smith, 954 F.2d at 347 (citing Sanchez, 914 F.2d 1355 ("even unarmed, [the plaintiff] was not harmless; a car can be a deadly weapon.").

21

was a "clearly established principle that deadly force cannot be used in non-deadly situations.").[13]

Impacting our review of reasonableness is a "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue." Graham, 490 U.S. at 396 (emphasis added); Lee v. Ferraro, 284 F.3d 1188, 1197-98 (11th Cir. 2002) (denying qualified immunity to officer on excessive force claim partially because of low level of plaintiff's offense; "Graham dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime ...."); Jackson v. Sauls, 206 F.3d 1156, 1170 n. 18 (11th Cir. 2000) ("A court may also factor in 'the severity of the crime ....'") (quoting Gold v. City of Miami, 121 F.3d 1442, 1446 (11th Cir. 1997); Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993) (same); see generally United States v. Kaplan, 286 F. 963, 974 (D.C. Ga. 1923) (holding that "in the case of a misdemeanor, the general rule that an officer has no right, except in self-defense, to kill the offender to effect his arrest, and that the 'killing of a fleeing person

_____

[13] To determine the constitutionality of a seizure "[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Graham, 490 U.S. at 8 (citing United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983); Delaware v. Prouse, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979); United States v. Martinez-Fuerte, 428 U.S. 543, 555, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976)).

under such circumstances would amount to murder.'"); <u>King v. State</u>, 91 Ga.App. 825, 828 (Ga. App. 1955) ("no arresting officer has any right to kill a person for trying to escape in the commission of a misdemeanor").

Thus, by 2001 the law was clearly established that a seizure must be reasonable under the circumstances, which include a review of the offense charged; that an automobile can be used as deadly force; and that deadly force cannot be used in the absence of the <u>Garner</u> preconditions.

The establishment of these principles distinguishes this case from <u>Brosseau v. Haugen</u>.  In <u>Brosseau</u>, the Supreme Court reversed the denial of qualified immunity to an officer sued for Fourth Amendment violations under § 1983 for shooting a suspected felon as he attempted to flee in a vehicle, where the officer had arguable probable cause to believe that the suspect posed an imminent threat of serious physical harm to several officers and citizens in the immediate surrounding area.[14]  Unlike Harris, Haugen, the suspect in <u>Brosseau,</u> was a

_____

[14] These facts are not comparable to those in <u>Harris</u>.  In the light most favorable to Harris, there is no comparable evidence that Scott had arguable probable cause to believe that Harris posed an <u>immediate</u> risk of death or serious danger to Scott, other officers, or nearby citizens. Harris was being chased for a traffic violation, not a "crime involving the infliction or threatened infliction of serious physical harm." <u>Garner</u>, 471 U.S. at 11, 105 S.Ct. 1694.  Unlike the situation in <u>Brosseau</u>, the parties were not in close physical proximity nor had they had a one-on-one struggle.  In fact, Scott and the other pursuing officers were following Harris from <u>behind in their squad cars</u>.  At the time of the ramming, apart from speeding and running two red lights, Harris was driving in a non-aggressive fashion (i.e., without trying to ram or run into the officers).  Moreover, unlike Haugen, who was surrounded by officers on foot, with other cars in

suspected felon with a no-bail warrant out for his arrest, with whom Brosseau, the officer, had a violent physical encounter prior to the shooting. Believing that Haugen had entered a Jeep to retrieve a gun, Brosseau broke the windowpane of the Jeep, and attempted to stop Haugen by hitting him over the head with the butt and barrel of her gun. Haugen was undeterred, however, and began to take off out of the driveway, without regard for the safety of those in his immediate vicinity – the three officers on foot (Haugen at his immediate left and two others with a K-9 somewhere nearby), a woman and her 3-year-old child in a small vehicle parked directly in front of the Jeep and 4 feet away, and two men in a parked vehicle 20 to 30 feet away. In addition, prior to shooting, Brosseau warned Haugen that she would shoot by pointing her gun at the suspect while commanding him to get out of the car, and then using the gun to shatter the glass of the car window and hit Haugen in an attempt to get the keys.

Looking to Garner, the Brosseau Court recognized that its clearly established deadly force rule (i.e., that "it is unreasonable for an officer to 'seize an unarmed non dangerous suspect by shooting him dead'") was limited by the

very close proximity in a residential neighborhood, Scott's path on the open highway was largely clear. The videos introduced into evidence show little to no vehicular (or pedestrian) traffic, allegedly because of the late hour and the police blockade of the nearby intersections. Finally, Scott issued absolutely no warning (e.g., over the loudspeaker or otherwise) prior to using deadly force.

24

Court's further instruction that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." Brosseau, 125 S.Ct. at 598 (quoting Garner, 471 U.S. at 11, 105 S.Ct. 1694). Thus, the Brosseau Court held that Garner did not provide a reasonable officer with fair notice of a Fourth Amendment violation in "the situation [Brosseau] confronted: whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." Id. at 600 (emphasis supplied).[15]

Scott also argues that Garner does not apply because in that case, the officer

---

[15] We also note that the Court in Brosseau acknowledged that the standard in Garner can "clearly establish" whether or not the use of deadly force is unconstitutional in an "obvious case." Brosseau, 489 U.S. at 599; United States v. Lanier, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) ("general constitutional rule already identified in the decisional law ... appl[ied] with obvious clarity to [his conduct]."). It is well-established that "general statements of the law" are perfectly capable of giving clear and fair warning to officers even where "'the very action in question has [not] previously been held unlawful.'" Lanier, 520 U.S. at 271 (quoting Anderson, 483 U.S. at 640, 107 S.Ct. 3034); Vinyard, 311 F.3d at 1350-51. While we need not conclude that the facts in Harris present just such an "obvious" case to deny Scott qualified immunity, this case may present such circumstances, since the evidence shows that Scott lacked the sufficient probable cause to warrant the use of deadly force. In this way, Harris is more like Vaughan than Brosseau or the cases cited therein. See Vaughan, 343 F.3d at 1333 ("appl[ying] Garner in a common-sense way" to hold that a reasonable officer would have known that it was unconstitutional to use deadly force during a high-speed pursuit where the suspect posed no immediate threat of harm to police officers or others). In the cases relied upon in Brosseau, the officer had arguable probable cause to believe that the suspects presented an immediate risk of danger to the officers or others. See Brosseau, 125 S.Ct. at 600 (citing Cole v. Bone, 993 F.2d 1328 (8th Cir. 1993) and Smith, 954 F.2d 343). Without the existence of an immediate threat of harm to the officers or others that could justify the officer's probable cause, the Garner rule prohibiting deadly force may apply with "obvious clarity."

25

applied the deadly force with a gun.  Scott relies on our holding in <u>Adams</u> that in 1985, the caselaw was insufficiently developed to give notice to every objectively reasonable officer that a police car ramming another car during a high-speed pursuit would constitute an unreasonable seizure.  However, the facts in <u>Adams</u> occurred before <u>Brower</u> was decided, and thus, at a time before the Supreme Court made clear that the intentional use of a vehicle to apprehend a suspect was a Fourth Amendment seizure.  That principle is now settled.  <u>Garner</u> made clear that the use of deadly force against an unarmed and nondangerous fleeing felony suspect was unlawful and set out the specific criteria necessary before the application of deadly force is warranted.  This law clearly applied to the use of a vehicle to seize a suspect at the time of the incident in this case.

We are satisfied that, under <u>Hope</u>, the requirement that the officers have "fair warning" that their conduct violates a constitutional right through a general constitutional rule, "even through the very action in question has [not] previously been held unlawful," has been satisfied.  536 U.S. at 740-41, 122 S.Ct. 2508 (internal quotation marks and citations omitted).  A reasonable police officer would have known in 2001 that a vehicle could be used to apply deadly force,[16]

---

[16] <u>See</u> citations on pages _____, <u>supra</u>.

could be used to effectuate a seizure,[17] and that deadly force could not be used to apprehend a fleeing suspect unless the conditions set out in Garner existed. Garner, 471 U.S. at 11-12, 105 S.Ct. 1694. See also Vaughan, 343 F.3d at 1329-30. The Garner Court used the term "deadly force," not "handgun," in enunciating its rule. Garner, 471 U.S. at 11-12, 105 S.Ct. 1694 ("Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used ...") (emphasis supplied). Moreover, the opinion recognizes the obvious principle that "deadly force" can be inflicted through other means. Id. at 14, 105 S.Ct. 1694 (observing that in times when weapons were rudimentary, "[d]eadly force could be inflicted almost solely in a hand-to-hand struggle ..."). See Vaughan, 343 F.3d at 1332 ("the Supreme Court in Hope cautioned that we should not be unduly rigid in requiring factual similarity between prior cases and the case under consideration"). See also Gutierrez v. City of San Antonio, 139 F.3d 441, 446 (5th Cir. 1998) (applying Garner "deadly force" rule to determine whether officers were qualifiedly immune for hog-tying suspect).

By 2001, it was well-established in this circuit that "deadly force" means

---

[17] Brower, 489 U.S. at 596-99, 109 S.Ct. 1378.

27

force that creates a substantial risk of causing death or serious bodily injury. Pruitt, 771 F.2d at 1479 n. 10.  The CCSD policy in 2001 employed a near-identical definition.  Moreover, by 1986, we had recognized the potentially lethal nature of an automobile.  See Gualdado, 794 F.2d at 1535, and other cases cited on pages _____, supra.

We are also satisfied that common sense would inform any reasonable officer that there would be substantial risks of death or bodily harm if he used his vehicle to ram another vehicle at high speeds in the manner employed in this case. See CCSD Use of Force Policy, R. 48, Ex. 12 at 82 (restricting the use of deadly force to "[w]hen the Deputy reasonably believes it is necessary to defend their [sic] own life or the life of another or to prevent grave bodily injury to themselves [sic] or another, and all other available means of defense have failed or would be inadequate or dangerous," or "[w]hen necessary to prevent the commission of ... any felony which involves the use or threat of physical force or violence against any person.").  See also Ga.Code Ann., § 17-4- 20(b) ("Sheriffs and peace officers ... may use deadly force to apprehend a suspected felon only when the officer reasonably believes that the suspect possesses a deadly weapon or any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury;  when the officer reasonably believes

28

that the suspect poses an immediate threat of physical violence to the officer or others; or when there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm."); Garner, 471 U.S. at 10-11, 105 S.Ct. 1694 ("The fact is that a majority of police departments in this country have forbidden the use of deadly force against nonviolent suspects."). Cf. CCSD Pursuit Policy, R. 48, Ex. 11, at 94 (categorizing roadway barricades as the use of deadly force and limiting their use "only by order of a supervisor and then only as a last resort when the person pursued has proven by his method of flight a total disregard for the lives and safety of the public"). See Vaughan, 343 F.3d at 1332-33 ("Applying Garner in a common-sense way, a reasonable officer would have known that firing into the cabin of a pickup truck, traveling at approximately 80 miles per hour on Interstate 85 in the morning, would transform the risk of an accident on the highway into a virtual certainty. The facts of this case bear out these foreseeable consequences. Thus, Deputy Cox is not entitled to . . . qualified immunity grounds, regarding Vaughan's § 1983 claim predicated on the Fourth Amendment.").

For the foregoing reasons, a jury could conclude that Scott unreasonably used deadly force to seize Harris by ramming him off the road under the instant circumstances, and we find no reversible error in the denial of qualified immunity

29

to Scott at this stage in this case. [18]

Consistent with the above conclusions, the district court opinion is

**REVERSED IN PART and AFFIRMED IN PART.**

---

[18] Scott is not foreclosed from seeking to assert a qualified immunity defense at trial if the facts proven at trial differ from those we consider here for summary judgment purposes.